## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

RICHARD S. LEHMAN, individually
and as the duly appointed Executor
of the Estate of Wilson C. Lucom;
RICHARD S. LEHMAN, P.A., and the
WILSON C. LUCOM TRUST FUND
FOUNDATION,

      Plaintiffs,

vs.

HILDA PIZA LUCOM;
MADELAINE ARIAS PIZA;
MARGARITA ARIAS PIZA;
MELINDA ISABEL ARIAS DE MORRICE;
FRANK MORRICE; GILBERTO ARIAS, JR.;
HECTOR INFANTE; EDNA RAMOS CHUE;
INFANTE & PEREZ-ALMILLANO;
JUAN BOSCO MOLINA;
MARTA LUISA CAÑOLA;
WILLIAM PARODI;
TANYA STERLING BERNAL;
OYDEN ORTEGA; ALBERTO CIGARRUISTA;
HARLEY J. MITCHELL; AND
JOHN DOES 1 THROUGH 19,

      Defendants.

_____/

## COMPLAINT AND JURY TRIAL DEMAND

## <u>TABLE OF CONTENTS</u>

COMPLAINT AND JURY TRIAL DEMAND ................................................................. 1

NATURE OF THE CASE .............................................................................................. 1

INTRODUCTION ......................................................................................................... 1

PARTIES AND RELEVANT NON-PARTIES ................................................................ 5

SUBJECT MATTER JURISDICTION AND VENUE .................................................... 10

PERSONAL JURISDICTION ...................................................................................... 10

FACTUAL BASIS FOR CLAIMS ................................................................................ 11

      A.     The Wilson C. Lucom Legacy

           (i) Lucom's Will ......................................................................... 14

           (ii) Lehman's Appointment – Order 1025 .................................... 18

      B.     The Conspiracy to Steal

           (i) The Arias Group's Conspiracy to Steal Lucom's Estate Begins. ............ 20

           (ii) Hilda Moves to Illegally Nullify the Will While Infante Exerts his Power and Influence to Corrupt the Panamanian Courts. ....................................... 22

           (iii) Theft of Lucom's Florida Estate Assets - The Valores Bearer Shares ... 24

           (iv) Interfering With Lehman's Ancillary Estate Proceeding in Florida ...... 27

      C.     The Campaign of False Criminal Actions and Defamation

           (i) Raising the Ante and Beginning a Campaign of False Criminal Accusations that Paint Lehman as a Murderer and Gang Leader ................. 28

           (a) False Murder Charge (Denuncia 1) ........................................ 29

           (b) False Gang and Theft Charges (Denuncia 2) ......................... 30

           (c) False Swindle and Theft Charges (Denuncia 3) ..................... 30

           (ii) The Attempted Extort and Bribery of Lehman ...................... 31

           (iii) A Temporary Set Back – The Dismissal of Lehman's Murder Charges. 33

(iv) Another Set Back – The Superior Court Uphold's Lehman as Executor 34

(v) Order Appointing Illegal Administrator – Order 229 ............................. 35

(vi) Campaign of Criminal Charges Continues.............................................. 36

(a) False Charge of Stealing Lucom's Estate (Denuncia 4) ......................... 36

(b) False Extortion Charge (Denuncia 5) ..................................................... 36

(vii) The International Slander Campaign Against Lehman......................... 37

(viii) Another False Criminal Complaint to Shut Down Lehman's U.S. Based
Law Firm Website and U.S. Based Website on Lehman's Efforts to Provide
for the Poor Children of Panama................................................................. 40

D.     The Campaign's Fall-Out

(i) Lehman is Vindicated – But Corruption Leads to False Arrests.............. 41

(ii) False Interpol Red Notice Alerts Calling for Arrests ............................. 43

(iii) Lehman's False Arrest on the Eve of Trial in Florida Surcharge Action
................................................................................................................... 46

(iv) A Murder Attempt on Lehman's Ally.................................................... 49

(v) Fraud on the Florida Court in the Florida Surcharge Action. ................ 49

E.     The Theft of Lucom Assets is Complete

(i) Corruption of the Panamanian Supreme Court. ...................................... 53

(ii) The Panamanian Ruling is utilized in Florida Surcharge Action............ 56

(iii) The Arias Group Completes its Plan to Steal the Lucom Estate .......... 58

CLAIMS FOR RELIEF – COUNT I – RICO, 18 U.S.C. § 1962 (c) .................................. 60

Pattern of Racketeering .............................................................................. 62

Pattern of Racketeering Activity: Mail Fraud and Wire Fraud in Violation of
18 U.S.C. §§ 1341, 1343.............................................................................. 62

Pattern of Racketeering Activity: Extortion in Violation of Hobbs Act,
18 U.S.C. § 1951 ......................................................................................... 64

Pattern of Racketeering Activity: Extortion in Violation of Section 836.05 of
the Florida Statutes..................................................................................... 67

iii

Patterns of Racketeering Activity: Money Laundering in Violation of 18 U.S.C. § 1956 ........................................................................ 67

Pattern of Racketeering Activity: Dealing in Stolen Property in Violation of Section 812.019 of the Florida Statutes....................................................... 68

Pattern of Racketeering Activity: Witness Tampering in Violation of 18 U.S.C. § 1512 ........................................................................ 68

Pattern of Racketeering Activity: Witness Tampering in Violation of Section 914.22 of the Florida Statutes ........................................................ 69

Pattern of Racketeering: Obstruction of Justice in Violation of 18 U.S.C. § 1503 ........................................................................ 70

Pattern of Racketeering: Obstruction of Justice in Violation of Section 843.02 of the Florida Statutes ........................................................ 71

Pattern of Racketeering: Violation of 18 U.S.C. § 1952(a)(3)(A) (the Travel Act) ........................................................................ 72

COUNT II – CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d).......................... 75

COUNT III – RICO, Fla. Stat. § 895.03 and § 772.104.................................................... 76

COUNT IV – UNJUST ENRICHMENT ............................................................................ 77

COUNT V – CONVERSION .............................................................................................. 78

PRAYER FOR RELIEF....................................................................................................... 78

DEMAND FOR JURY TRIAL ........................................................................................... 80

**COMPLAINT AND JURY TRIAL DEMAND**

Plaintiffs, Richard S. Lehman, individually and in his capacity as the duly appointed Executor of the Domiciliary Estate of Wilson C. Lucom ("Lehman"); Richard S. Lehman, P.A., a duly organized Florida professional association ("Lehman, P.A."), and Wilson C. Lucom Trust Fund Foundation ("Foundation"), by and through its Sole Trustee, Lucom World Peace, a Panamanian corporation, sue Defendants and allege as follows:

**NATURE OF THE CASE**

1.      This is an action for damages in excess of Seven Hundred Thirty-Two Million Dollars ($732,000,000) arising from multiple violations by the Defendants of the Racketeer Influenced and Corrupt Organization Act (RICO), 28 U.S.C. § 1961 *et. seq.*, involving predicate acts of extortion, mail and wire fraud, money laundering, obstruction of justice, witness tampering, theft, dealing in stolen property, and multiple violations of the Foreign Corrupt Practices Act and the Federal Travel Act, as more fully alleged below. These acts were committed by the Defendants in this District with the assistance of others, known and unknown, with the singular purpose of stealing for themselves the vast fortune of Wilson C. Lucom, deceased, who left that fortune through his Last Will and Testament, to his Foundation for the benefit of the poor and needy children of the Republic of Panama.

**INTRODUCTION**

2.      This action involves a criminal conspiracy targeting the Plaintiffs and conducted by Defendants in Florida and abroad.   This Complaint details how a group of U.S. and Panamanian individuals, lawyers, judges and prosecutors set about to fraudulently loot millions of dollars from a decedent's estate, and destroy the estate's Executor's ability to carry out the decedent's wishes, the primary directive being to use the estate's millions

1

to feed the poor children of Panama.  The criminal conspiracy had one objective: thwart the only person who was appointed the Executor of the Estate of Wilson C. Lucom (the "Estate"), through acts of intimidation extortion, corruption, theft, money laundering, and bribery of foreign officials, so that the Defendants could steal the Estate assets for themselves.  The Defendants' criminal conspiracy could not succeed (even as it continues today) absent the combined acts of the Defendants in the United States, Panama and the British Virgin Islands.

3.    Plaintiff Lehman is the person appointed the Executor ("Albacea") of the Estate of Wilson C. Lucom.  The conspirators' goals were to destroy Lehman financially, destroy his reputation and interfere in every way imaginable with Lehman's legal obligations and duties to protect and distribute Lucom's assets in accordance with Lucom's written Will.  In effect, the RICO Defendants planned to control the proceeds of the Lucom Estate, shutting out the Executor, overriding Lucom's bequest to feed the poor, and setting themselves up as the sole recipients of the assets of the Estate. In Panama, the conspirators used the criminal justice system and corrupt prosecutors to falsely charge Lehman, a 41 year member in good standing of the Florida Bar, with 15 crimes, including murder, and to illegally arrest Lehman and his lawyer, causing Lehman and the professionals hired to assist him to fear for their lives in Panama, the United States and abroad, to avoid travel from Florida to Panama, thereby thwarting Lehman in his efforts to fulfill his duties as Executor.  Following the eventual dismissal of the corrupt criminal charges against him and without any charges pending, the conspirators then arranged to have the Panama branch of Interpol illegally black-list Lehman and his lawyer by placing them on "Red Notice Alert," naming Lehman and his lawyer as dangerous criminals in 170 countries, including in the

United States, resulting in Lehman being escorted off of a commercial airplane bound for Florida and detained in Panamanian jail on multiple occasions.  The conspirators also abused the Panamanian civil justice system by bribing judges in order to obtain various rulings and orders adverse to Lehman and the Estate. Some of these corrupt rulings were then falsely touted by Defendants and introduced in evidence in legal proceedings in Florida as though they were legitimate dispositive court orders from Panama.

4.     In Panama, a corrupt civil Panamanian Probate Judge and an illegally appointed administrator prevented Lehman from protecting the Estate's main Panamanian asset and the Estate's Florida bank and securities accounts.   Through the Defendants conspiracy, the Estate's 7,000 acre ranch that lines the Pacific Ocean, appraised at $145,000,000 (and currently valued at $175,000,000), has been gutted by Defendants.  The administrator appointed by a corrupted judge in Panama conspired with other Defendants to steal the ranch's 110 beachfront acres and loot proceeds in the Estate's Panamanian bank accounts. On a parallel tract in Florida, Defendants introduced in a Florida Court proceeding illegal and unconstitutional Panamanian Probate Court Orders, obtained by Defendants through bribery and corruption, in order to ruin Lehman's reputation, law practice, and thwart Lehman's efforts to protect the Florida Estate assets from being looted by Defendants. This left the Estate exposed to Defendants' theft of the most valuable assets in Florida worth almost $6 Million.

5.     Lehman ultimately had all of the Panamanian illegal lower court orders overruled, suspended, or successfully challenged, and has been continually approved by the Intermediate Appellate Courts of Panama as the Executor/Albacea of the Estate. Nevertheless, the conspirators bribed a panel of three Justices of the Panamanian Supreme

Court, the highest Court in the land, who rendered an opinion rewriting Lucom's Will.  The corrupt Opinion of the Supreme Court of Panama purports to appoint Lucom's widow, Defendant Hilda Piza Lucom ("Hilda") Executor of the Estate retroactively to the initial probate filing and then declares Hilda the "universal heir" of the Estate.  This corrupt Opinion has been stayed by an *en banc* panel of the entire Supreme Court of Panama.  Furthermore, this Opinion is the subject of a nullification action in Panama by a Panamanian Public Prosecutor.  All three of the corrupt Justices are the subject of two criminal complaints in the Panamanian Congress, including one that was launched by the Panamanian Notary that witnessed and transcribed Lucom's Will.

6.      The corruption by the Defendants of the Panamanian judicial system is not mere speculation.  The actual meeting with one of the Supreme Court Justices on the Panel, where Hilda's lawyer offered and negotiated a $1.5 million bribe to each Justice of the Panel, occurred in the presence of two other lawyers.  Once the corrupt Opinion became public, and the grotesque and obvious corruption became *vox populi* in all Panama, the U.S. State Department stepped in and revoked the U.S. visas of the three Justices of the Supreme Court of Panama, who rendered the corrupt Opinion. Further, since at least 2009, multiple cables were issued by the United States Ambassador to Panama regarding the corruption in the Panamanian judiciary.  Notwithstanding these recent events, the illegal and corrupt orders and decisions, while they pended for years, permitted the Defendants ample time to steal the assets of the Estate and, through a malicious media campaign of defamation, Defendants ruined (and continue to ruin) Lehman's and Lehman, P.A.'s business, professional reputation, and standing in the community.

## PARTIES AND RELEVANT NON-PARTIES

**Plaintiffs:**

7.      Richard S. Lehman ("Lehman"), is an adult resident of Palm Beach, Florida, and is an attorney duly licensed to practice law in the State of Florida.  Lehman was named in the Last Will and Testament of Wilson C. Lucom as one of the Executors of Lucom's Estate.  On July 5, 2006, shortly after the death of Wilson C. Lucom in Panama, Lehman was appointed the sole Executor of the Wilson C. Lucom Estate ("Lucom Estate") in Panama.  Lehman was thereupon duly sworn and installed as Executor and has continued to be the sole Executor of the Lucom Estate to this date.

8.      Richard S. Lehman, P.A. ("Lehman, P.A.") has been since 1984, and continuing to this day, a duly incorporated professional association in the State of Florida with its principal place of business located at 6018 S.W. 18th Street, Suite C1, Boca Raton, Florida 33433.

9.      Wilson C. Lucom Trust Fund Foundation ("Lucom Foundation") was registered on May 26, 2006 as a trust in the island of Nevis, British West Indies, and later domesticated as a Panamanian trust.  The sole trustee of the Lucom Foundation is Lucom World Peace, S.A., a duly incorporated company in the Republic of Panama.  Pursuant to the terms of Lucom's Will, his Executors were also named the trustees of his Foundation and were charged with the duty of managing the Foundation for the benefit of the poor and needy children of Panama.  Thus, Lehman is also the sole director of Lucom World Peace, S.A., which is the sole trustee of the Lucom Foundation.

**RICO Defendants:**

10.     Defendant, Hilda Piza Lucom ("Hilda"), is a United States citizen who resided in Palm Beach, Florida for fifteen (15) years prior to moving to Panama City, Republic of Panama.  Hilda was Lucom's widow. Hilda passed away on August 24, 2011 while living in Panama.  Hilda died a U.S. citizen owning assets in the State of Florida by reason of her marital share claim in the Florida ancillary probate proceedings of the Lucom Estate. Prior to her death, within one month after Lehman started to administer the Will in Panama, Hilda attempted to nullify the Will and claimed, despite Lucom's express direction in his Will to the contrary, that the entire fortune was hers with nothing to go to the poor children of Panama. Prior to marrying Lucom, Hilda was the wife of Gilberto Arias, the former finance minister of Panama and the scion of a powerful Panamanian family, which includes two former Panamanian Presidents.

11.     Defendant, Madelaine Antonia Arias Piza ("Madelaine") is an adult resident of New York, New York and one of Hilda's daughters from Hilda's marriage to former finance minister of Panama Gilberto Arias.  Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraphs 30-31.

12.     Defendant, Margarita Arias Piza ("Margarita") is an adult resident of Palm Beach, Florida and one of Hilda's daughters from Hilda's marriage to former finance minister of Panama Gilberto Arias.   Exercise of jurisdiction over this Defendant is reasonable and proper as she resides in this District.

13.     Defendant, Melinda Isabel Arias de Morrice ("Melinda") is an adult resident of Panama City, Panama, and is one of Hilda's daughters from Hilda's marriage to former

finance minister of Panama Gilberto Arias. Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraphs 30-31.

14.     Defendant, Frank Morrice ("Frank") is an adult resident of Panama City, Panama, and is Hilda's son-in-law. Frank is Melinda's husband. Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraphs 30-31.

15.     Defendant, Gilberto Arias, Jr. ("Gilberto") is an adult resident of Panama City, Panama, who recently was dismissed as Panama's Ambassador to Great Britain. Gilberto is Hilda's son from Hilda's marriage to former finance minister Gilberto Arias and the grandson of former Panamanian President Harmodio Arias. Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraphs 30-31.

16.     Defendant, Hector Infante ("Infante") is an adult resident of Panama City, Panama, and is a practicing attorney. At all material times, Infante held himself out as the duly appointed attorney, agent and representative of Hilda and other Defendants named herein. Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraphs 30 and 32.

17.     Defendant, Edna Ramos Chue ("Ramos") is an adult resident of Panama City, Panama, and is a practicing attorney.  Ramos was the law partner of Infante during most of the time that the Lucom Estate proceedings, in Panama and Florida, were active. Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraphs 30 and 32.

18.     Defendant, Infante & Perez-Almillano ("Infante Firm") is a duly organized partnership under the laws of the Republic of Panama.  The Infante Firm has its principal offices in Panama City, Panama at Calle 50 and 74, San Francisco, 909 Building, 14th Floor.  Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraphs 30 and 32.

19.     Defendant, Juan Bosco Molina ("Molina") is an adult resident of Panama City, Panama.  Molina is the presiding trial Judge in the Fifth District in Panama City, Panama, with jurisdiction in the administration of the Lucom Estate pending in Panama. Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraph 30.

20.     Defendant, Marta Luisa Cañola ("Cañola") is an adult resident of Panama City, Panama.  Cañola was illegally appointed by Molina as the Administrator of the assets located in Panama in the Lucom Estate, when under Panamanian law an Administrator may only be appointed when there is no Will.  Molina then took immediate control of the Lucom Estate assets which include a 7,000 acre parcel of land located on the Pacific Coast of Panama which Cañola herself has had appraised for $145,000,000 in 2006 excluding personal property. This parcel is owned by a Panamanian holding company named Hacienda Santa Monica, S.A. which was beneficially owned by Wilson C. Lucom until his death. Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraph 30.

21.     Defendant, William Parodi ("Parodi") is an adult resident of Panama City, Panama. Parodi was a government prosecutor for the Fourteenth District of Panama.

Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraph 30.

22.     Defendant, Tanya Sterling Bernal ("Bernal") is an adult resident of Panama City, Panama.   Bernal is a government prosecutor for the Fourth District of Panama. Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraph 30.

23.     Defendant, Oyden Ortega ("Ortega") is an adult resident of Panama City, Panama.   Ortega is a sitting Judge on the Supreme Court of Panama, Civil Division. Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraph 30.

24.     Defendant, Alberto Cigarruista C. ("Cigarruista") is an adult resident of Panama City, Panama.   Cigarruista is a sitting Judge on the Supreme Court of Panama, Civil Division.   Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraph 30.

25.     Defendant, Harley J. Mitchell ("Mitchell") is an adult resident of Panama City, Panama.   Mitchell is a sitting Judge on the Supreme Court of Panama, Civil Division. Exercise of jurisdiction over this Defendant is reasonable and proper for the reasons set forth below in paragraph 30.

26.     Certain other non-party individuals played roles, direct or indirect, in the scheme to steal the assets of the Lucom Estate and thwart the Executor's efforts to carry out the directives set forth in Lucom's Will.

27.     Defendants, John Does 1 through 19 are unknown co-conspirators and subsequent transferees of the lands of the Hacienda Santa Monica Ranch and the funds stolen from bank accounts located in Florida which were assets of the Lucom Estate.

## SUBJECT MATTER JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over Plaintiffs claims under 28 U.S.C. §§ 1331, and under 18 U.S.C. § 1964(c). Plaintiffs first claim for relief arises under 18 U.S.C. §1961 *et seq.*, as hereinafter more fully appears. Plaintiffs state law claims arise out of the same case or controversy as its federal law claims, as all claims in this action arise out of a common nucleus of operative facts. Thus, this Court also has supplemental jurisdiction over Plaintiffs state law claims under 28 U.S.C. § 1367.

29.     Venue is proper in this District under 28 U.S.C. 1391(b)(2), as a substantial number of the events giving rise to this action occurred in this District, and also under 18 U.S.C. § 1965(a).

## PERSONAL JURISDICTION

30.     Each Defendant, either individually, or through its agents have committed tortious acts against Plaintiffs within this District and State, and have engaged in intentional, wrongful, illegal and tortious acts, the effects of which the Defendants knew and intended to be felt in the United States and the State of Florida.  Personal jurisdiction over the Defendants may therefore be exercised pursuant to Section 48.193(1)(b) and (2), Florida Statutes (2011) and because Defendants have sufficient contacts with this forum so as to satisfy traditional notions of fair play and substantial justice under the Fourteenth Amendment of the United States Constitution.

10

31.     Additionally, Defendants Hilda, Madelaine, Margarita, Melinda, Frank, and Gilberto, collectively referred to as the "Arias Group," submitted themselves to the jurisdiction of the State of Florida by filing actions in the State against Lehman in furtherance of the RICO conspiracy alleged herein.

32.     Defendants Ramos, Infante, and the Infante Firm further submitted themselves to the jurisdiction of the State of Florida by appearing in Florida multiple times with Hilda in furtherance of the RICO conspiracy alleged herein. Ramos and the Infante Firm's presence in Florida included, but were not limited to, October 2006 and March 1, 2007 appearances at Hilda's depositions in the Florida surcharge action.

## FACTUAL BASIS FOR CLAIMS

33.     In June of 2006, Wilson C. Lucom ("Lucom"), an expatriate American living in Panama, passed away leaving a fortune which at the time of his death exceeded $50 Million.  In accordance with Lucom's Will, almost all Lucom's fortune was left to the Lucom Foundation, established under Lucom's Will for the benefit of the poor and needy children of Panama.  Lucom's Will, in fact, was very specific and detailed in this regard and he directed that his Foundation, managed by his named Executors, provide for school lunches in the neediest neighborhoods of Panama. Lucom's bequest is the largest gift of its kind in Panama's history.

34.     Lucom was a U.S. national who arrived in Panama in 1995.  In the 1980's, Lucom married his third wife, Hilda, who was a member of one of the most influential families in Panama. Hilda's first marriage was to Gilberto Arias, a former finance minister of Panama and descendant of two former Presidents of Panama. Hilda's first marriage produced five children, two of whom remain in power positions in Panama (Melinda and

11

Gilberto) and two of whom reside in the U.S., one in Florida (Margarita), and the other in New York (Madelaine). The other lives in Switzerland. Lucom had no children of his own.

35.     After several years in Panama, Lucom experienced problems with his wife's children. Particularly, after Lucom's arrival to Panama he became alienated from certain members of Panama's "elite society" because of a strident legal contest between Lucom and Alberto Vallarino, one of Panama's leading citizens whose real estate development, Buenaventura, borders on Lucom's Hacienda Santa Monica.  This legal contest disturbed Hilda's children and their social status in Panama, and Melinda made Lucom an outcast. Lucom grew continually resentful of the behavior of Hilda's children in Panama as they isolated him and their mother more and more from Lucom.  At times, at social gatherings, Lucom was forced by Melinda to sit at a separate table in the kitchen because according to Melinda "he was not allowed to sit with decent people."

36.     Plaintiff Richard Lehman is a South Florida attorney who had been Lucom's faithful attorney and friend for thirty one (31) years. Lucom was one of Lehman's first clients when he started his professional law practice.  Lucom was Lehman's mentor and a father figure to Lehman.  The two were not only lawyer and client, they were fishing buddies.

37.     Lehman is a long time resident of South Florida, having practiced law for forty two (42) years with an impeccable record as an attorney and community leader. Before starting his private practice in Florida, Lehman graduated from Georgetown Law School in Washington D.C.; obtained an LLM, master's degree in tax law at New York University Law School and served for years as a Senior Attorney with the Internal Revenue Service of the United States and as a law clerk to Judge William Fay on the United States

Tax Court in Washington D.C. He has continually held an "AV" rating as an attorney since the beginning of his career. Lehman also served in the Judge Advocate General's Corp. of the United States Army Reserves. Prior to commencing work as the Executor of Lucom's Estate, Lehman had never been accused of any criminal wrongdoing whatsoever and was held in the highest esteem in his community by individuals from the political, religious, legal, financial and other sectors. His record of 42 years as a member of the Florida Bar has been free of ethical complaints or malpractice actions.

38.    Lehman and Lucom continued to communicate after Lucom moved to Panama; sometimes as lawyer-client and sometimes as friends. Lucom grew reliant on Lehman, particularly in the last nine months of his life during which time Lucom's health deteriorated. Lehman devoted a substantial amount of attention to Lucom, flying to Panama regularly, both for purposes of Estate matters and for attending to Lucom's health needs.

39.    Lucom was an enterprising man and a sensitive soul who gave up his U.S. citizenship and moved to Panama hoping to find favor with Hilda's family.  Lucom had no natural children of his own and only distant family relatives except his passing relationship with his stepdaughter, Isabel Clark, who was his stepdaughter from his second marriage.

40.    Lucom witnessed the needs and the hunger endured by thousands of Panamanian children, particularly in the rural areas; therefore, he decided to leave in his Will, written on June 20, 2005, most of his fortune, which at the time of his Will was estimated at $50 million, for the poor children of Panama. Lucom directed that the Estate assets be managed and distributed by his "Foundation Wilson C. Lucom Trust Fund," created for this purpose.

## Lucom's Will

41.    Lucom's Last Will and Testament ("Lucom's Will") is not complicated. The pattern of his Will ensures that every asset he owned at death ultimately is given to the poor children of Panama except for those assets necessary to meet the very limited specific bequests he mentioned in his Will.

42.    Lucom's Will identifies separately all his real estate (the "Real Estate") and leaves all of his identified Real Estate directly to the Foundation, a domesticated Nevis Trust with a corporate Trustee that is registered in Panama. The sole purpose of the Foundation is to feed the poor children of Panama. The main piece of real property, Hacienda Santa Monica, belongs to a Panamanian corporation known as Hacienda Santa Monica, S.A. This corporation was 100% owned by Lucom. Since Lucom's death in 2006, the value of the property held by Hacienda Santa Monica has skyrocketed to over One Hundred Seventy Five Million ($175,000,000) dollars.   The property is located on the Pacific Coast of Panama with approximately 110 acres of direct beachfront. The property borders on Buenaventura, a property with a luxury hotel and residential development.  A new international airport is also being constructed a few miles away. This area of the Pacific Coast of Panama has been designated by the country of Panama for tourist developments. Lucom also authorized the sale of real estate in Okeechobee, Florida (appraised at $290,000 in 2006) "at any time" for the benefit of the Foundation and left his property located in California directly to the Foundation.

43.    In addition to the Real Estate, Lucom's estate also consisted of almost $10 Million in additional assets. These financial assets were also identified in Lucom's Will as "7.0 Million or more in other assets." These assets were to be used to pay the following life

estates to Hilda Lucom and to Lucom's stepdaughter, Isabel: $240,000 per year to Hilda for life; $200,000 per year to Isabel for life. Specific bequests included:

a. After the death of Hilda, $1 Million is to be given to the Mayo Clinic in Rochester, Minnesota, which provided care for Lucom during his fight with bladder cancer;

b. After the death of Isabel, $2 Million is given to 19 different individuals, mostly United States persons and a few Panamanians, representing friends and employees, distant family members and members of Hilda's Family. By Lucom's express wishes, Melinda and Gilberto both were to receive only $50,000.

44.     Any funds remaining in the balance after the deaths of Hilda and Isabel (the "Remaining Balance") will pass to the Foundation. The object of the Foundation was to feed children with needs in Panama and Lucom gave instructions to look for areas where there were children's schools that had no meals for lunch. Lucom explained that the principals of the schools had to form groups of volunteers with parents and other persons to plant gardens with seeds, so that they would bear fruit in the future to first feed the children in the area, and then to provide income from their sale.

45.     Lucom was so intent on leaving his fortune to the poor children of Panama that he even left them all of his personal property. Hilda only had the right to use the furniture in their home during her life. After her death, all of Lucom's personal assets were to go to the poor children of Panama. Lucom purposely left nothing to Hilda that she could pass on to her children except the home they shared and specific limited bequests to all five of Hilda's children.

46.     Lucom's Will, as to this issue was very clear.  Lucom in several places where he commented on Hilda's bequests stated the following:

> "[the annuity] shall be solely for her use while she lives, and after her death all bequests end and what was given to her must be returned to the Wilson C. Lucom Foundation, as of her death."

47.     In addition to the sprawling Hacienda Santa Monica, the other primary asset of the Estate is a British Virgin Islands corporation named Valores Globales, S.A. ("Valores"). Valores was incorporated by Lucom in 1997 as a holding company for various investments and other assets located in the United States. Upon its inception in April 1997, Valores issued two bearer shareholder certificates totaling 1000 shares to Lucom. Lucom retained possession of these bearer shares until his death. At the time of Lucom's death, Valores' assets included a bank account at Wachovia Bank, NA ("Wachovia") in Palm Beach County, Florida. Wachovia account number 200000750934 (the "Wachovia Account") contained approximately $3.4 million belonging to Valores. Lucom was the sole signatory on the Wachovia account. Another Valores asset in Palm Beach County, Florida, is a brokerage account at vFinance Inc. ("vFinance"). vFinance account number N3F:013625 (the "vFinance Account") contained approximately $370,000 belonging to Valores. Lucom had sole control of the vFinance account on behalf of Valores. Valores also owned two Promissory Notes.  One of those notes was executed by Christopher Ruddy ("Ruddy"), in the amount of $1,500,000.  Ruddy, a resident of Palm Beach, Florida, had been a friend of Lucom and had been named in the Will as one of three co-executors. Valores owned and held Ruddy's Note at the time of Lucom's death.  The other note was executed by a company owned by Lehman in the amount of $500,000.  Lehman personally

guaranteed the loan from Valores and at the time of Lucom's death, Valores owned and held this note.

48.     If Lucom's Will is carried out, as written, the Remaining Balance, plus the Real Estate, after paying fees and expenses of the sale of Hacienda Santa Monica and other costs would well result in more than $100 Million going to the poor children of Panama, as Lucom wished.  This would be the largest gift of its kind in the history of the Republic of Panama.

49.     It was also very clear that Lucom wanted to make sure that Hilda's children received nothing other than the relatively small specific bequests he gave them in his Will.

50.     Further, Lucom left his Will in a public deed attested to by a Notary of Panama, Dr. Mario Velasquez Chizmar ("Chizmar").  Under Panamanian law, a Will completed in this fashion requires a very high standard of proof to be overturned and declared invalid. Lucom's Will is precise and comports with all legal formalities.

51.     Lucom's Will originally appointed Lehman, Hilda, and Ruben Chinchorro Carles ("Chinchorro") as his three Executors. By way of a first Codicil that was completed several months before Lucom passed away, Chinchorro was replaced by Ruddy.  According to the Will, "each Executor must receive FIFTY THOUSAND DOLLARS (US$ 50,000.00). If Mr. RICHARD LEHMAN reaches three hundred hours of working in executing this Will, then Mr. RICHARD LEHMAN must receive payment pursuant to his regular fee schedule."  By way of a second Codicil, Lucom sought to make a specific bequest of personal property to one of his long-time employees.  His lawyers began drafting the instrument for the limited bequest by using his first Codicil as a form.  As a result, and due solely to a scrivener's error, the lawyer mistakenly included the language

17

from the earlier Codicil removing Chinchorro and appointing Ruddy as the third Executor, thereby replacing the clause naming the Executors of the Will with the small bequest of personal property to Lucom's employee.

**Lehman is Appointed Executor of Lucom's Will – Order 1025**

52.      On June 2, 2006 Lucom passed away, and shortly thereafter the Fourth Civil Circuit Court in and for the First Judicial Circuit of Panama (the "Panamanian Probate Court") on July 5, 2006, appointed Lehman as the sole Executor of the Lucom Estate (hereinafter "Order 1025").  Instead of appointing the three Executors named in Lucom's Will and Codicils, the Judge appointed Lehman as the sole Executor.  When faced with the issue that Lucom's second Codicil had inadvertently deleted the clause appointing Lucom's Executors, the Judge reasoned that Lucom could not have intended to leave his Estate and his Foundation without *any* Executors, especially when Lucom referred to Lehman as an Executor in other sections of the Will and further reaffirmed his Will and all its sections. The Court then appointed Lehman as the sole Executor because as to him, there could be no dispute that Lucom had appointed Lehman his Executor providing further, that Lehman would be paid his normal hourly rate beyond the first 300 hours expected on Estate administration.  Upon being appointed the Executor of Lucom's Estate, Lehman swore an oath upon the Bible to uphold Lucom's Will and to protect the Foundation with Lucom's money.  All appropriate procedures were followed in Lehman's appointment, including all notice requirements.

53.      Almost immediately after Lehman's appointment as Executor, Lehman made the necessary banking arrangements to transfer all of Lucom's liquid accounts into a Panamanian account for the Estate. Lehman met with numerous lawyers and beneficiaries

regarding all Estate matters and real estate matters for the sale of Hacienda Santa Monica. Initially, the Arias Group indicated they were going to honor Lucom's wishes and allow for the funding of the Foundation for the benefit of the poor in Panama.

54.     In addition, in early July 2006 intense discussions were held between Gilberto, acting on behalf of Hilda, and Lehman in hopes of amicably and efficiently administering Lucom's Estate to avert a contested probate proceeding. Lehman offered the amount of $10 Million to Hilda instead of her $240,000 life estate from the Will which was also supplemented by a $60,000 yearly fee as one of the Executors of Lucom's Estate. Because the Lucom Estate is comprised of over 80% of non-income producing property (and in fact income losing real estate) Lucom's Estate could ill afford to be the victim of a dragged out legal battle. This would leave significant funds for Hilda –then 84 years old and suffering from Parkinson's Disease –and would allow Hilda to provide for her children in spite of Lucom's wishes that they receive little from his Estate.

55.     On July 13, 2006 Lehman met in Panama with Gilberto, and the two agreed upon a settlement. The following day, on July 14, 2006 Gilberto sent a letter to Lehman's lawyer, Alvaro Aleman of Icaza Gonzalez Ruiz and Aleman ("IGRA") confirming the agreement.  Significantly, Gilberto stated:

> . . . I write to confirm the salient details of my conversation with Richard yesterday. In essence, we see the logic in dealing with the inheritance agreement in parallel to and being executed after the actual estate proceedings; the procedure should speed simplify and yield more certainty to the agreement than if same were brought forth under the estate proceeding per se. . . . As we discussed, Mrs. Lucom would receive, either herself or her nominee, a total of $10 million. . . . I think in the next few days . . . I will be going across to IGRA to begin to map out the agreements in order to put the above in place.

56.     Essentially Gilberto's letter captured all of the material and salient terms, and Lehman's letter of July 18, 2006 affirmed the deal.  Gilberto entered into an agreement

with Lehman as the sole Executor at the time (by way of Order 1025), that Gilberto's mother, Hilda, was "thrilled with." However, this deal would have prevented the rest of the Arias family from taking a piece of the vast majority of Lucom's Estate which was going to the poor children of Panama by way of the Foundation.

57.     Moreover, on July 19, 2006 Lehman relying on his appointment under Order 1025 as the named Executor in the Panama Will, petitioned the probate court in and for Palm Beach County, for ancillary administration of Lucom's Will in order to administer the Estate's substantial Florida assets ("Ancillary Estate").

58.     By July of 2006, then, Lehman, as the sole appointed Executor of Lucom's Estate had already reached an agreement with Hilda and Gilberto to amicably and efficiently administer Lucom's Estate assets to avert a contested probate proceeding, and Lehman was already underway to administer Lucom's Florida assets in the Ancillary Estate proceeding.  This course of action was in accord with Lucom's intent as indicated in his Will. That is, Hilda's children, Melinda, Madelaine, Margarita, Gilberto and (step son) Frank, would receive a *de minimus* portion of Lucom's Estate. The vast majority of Lucom's Estate would instead go to Lucom's Foundation, and ultimately the poor children of Panama.

**The Arias Group's Conspiracy to Steal Lucom's Estate Begins.**

59.     Lucom's Will, as written, was not acceptable to Hilda's children who needed a large stake of Lucom's Estate to maintain their status as Panamanian elite, and maintain their lavish lifestyle. Hence, on July 14, 2006, Melinda and Frank initiated an appeal of Order 1025, purportedly on behalf of Hilda, and through their attorney Jose Salvador Muñoz.

60.     The appeal argued, in pertinent part, that the probate court "[admitted an executor], when in fact there are none, and that as a simple matter of discussion, would have been three." From its onset, the Arias Group, and their attorney, Muñoz, argued in contradictory fashion that the Panamanian probate court both erred in finding that the Will called for an Executor *and erred in finding one executor rather than three.* That is, Hilda simultaneously accepted Lucom's Will but objected to some parts of it, in particular, to Lehman's appointment as the Executor.

61.     From here, the Arias Group began a conspiracy to steal Lucom's Estate assets by obtaining a series of illegal Panamanian probate Orders from a corrupt Panamanian Judge, and then would introduce these Orders into the Florida Ancillary Estate proceeding with the intent of defrauding the Florida Court and extorting Lehman into resigning as Executor of Lucom's Will.

62.     By way of background, and to fully understand the Defendants plan to corrupt the Panamanian courts, it is necessary to understand Panama's probate system. First and foremost, under Panamanian law, as under general United States laws, it is the decedent who appoints the Executor (Albacea) in his Will and *not* the Panamanian court. Second, once the Albacea has been named in the Will by the decedent, the Panama court decides whether appointing the named Albacea(s) would violate any of the legal restrictions that would prohibit the person from service as Albacea. If not, as occurred with Lehman, the Albacea is installed. Third, when the appointed Albacea accepts the appointment to the position, the Albacea must preserve and protect the Estate and cannot resign without court approval. Fourth, the only way to remove the Albacea is by death, impossibility, resignation or removal through judicial proceedings. It should be particularly

emphasized that there is no Panamanian code that permits the suspension of the Albacea's power.  This is because the Albacea, once appointed,  has now stepped into the shoes of the decedent and must preserve, protect and dispose of the decedent's property as the decedent would. Fifth, if an appeal is taken from a Panamanian probate court under the "deferred effect," the order which is appealed is not suspended and is in full force and effect until the disposition of the appeal. Finally, like the courts in Florida, an appeal divests the lower court of jurisdiction over the issue on appeal.   Because Lehman's appointment was on appeal, the Panama Probate Court had no jurisdiction to revisit Lehman's appointment during the pendency of the appeal proceedings. This fact did not stay a corrupted Panamanian judge from doing just that.

**Hilda Moves to Illegally Nullify the Will While Infante Exerts his Power and Influence to Corrupt the Panamanian Courts.**

63.     On August 18, 2006, Hilda filed a motion through the Arias Group's lawyer, Infante, to nullify the Will so that she would be named the universal heir and obtain for herself and her children the tens of millions of dollars that were earmarked for the children of Panama.   Under Infante's plan to corrupt the Panamanian court, Infante had Hilda's other attorney, Salvador Muñoz, appear in the Panamanian Court and falsely state that Lehman had a "quasi criminal background" and had already stolen $600,000 from Lucom's Wachovia account in Florida.   This was false. Muñoz made no mention of the fact that Lehman had merely opened a new bank account in the same bank for the same amount of money in the name of the Estate as he was required to do by law.

64.     A few days after Muñoz's court statements about Lehman were made, Hilda appointed a new lawyer, Infante. Using Muñoz's court statement as "evidence" that Lehman was a criminal, Infante convinced the Probate Judge, who had relied on Infante's

22

false statements, that she had appointed as the sole Executor, a "gringo" with a crooked background, who had already stolen $600,000 and was on his way to steal everything from the Foundation, and ultimately the poor children of Panama.

65.    In response to this, and notwithstanding that the order appointing Lehman the Executor was on appeal, Lehman was "suspended" as Executor on August 31, 2006, in Order 1227 and prevented "from availing himself of his designation as executor of the will in the estate of the late Wilson Charles Lucom from performing acts of administration, establishment of liens, or any acts of disposition of the property of the testate . . . ." Essentially, the Probate Court, which was divested of jurisdiction because the prior order appointing Lehman (Order 1025) was on appeal to the Superior Court, took an unauthorized action to freeze all of Lucom's Assets, in a calculated move by Infante to ensure that Lehman could not fight to defend the Will with Estate funds.

66.    Furthermore, this illegal "suspension order" was bizarre in another sense. The Probate Court, without any jurisdiction, by itself changed Hilda's appeal from the "deferred effect" (e.g. not staying Lehman's authority to act as Executor pending appeal) to the "suspensive effect" (e.g. staying Lehman's ability to act as Executor pending appeal) confusing Lehman's authority to act as Albacea.  The "suspensive effect" cannot even be applied under Panamanian law in the case of an Albacea since this permits the suspension of the Albacea's ability to protect the Estate.  In a recent ruling on August 10, 2011 the Panama Superior Court (e.g. intermediate level Appellate Court) held that the illegal modification to Lehman's appeal from "deferred" to "suspended" was of no validity. Similarly, in another Superior Court ruling after the Probate Court's entry of Order 1227, Judge Eva Cal opined that a Probate Court cannot make any rulings whatsoever related to

23

the Executor, when the appointment of the Executor is on appeal: "if what appealed is precisely the designation of the executor [as here]**, the lower court judge can do nothing related to the matter of the executor lest he usurp a competence that is not his and violate [Panamanian law]**."

67.    Order 1227 crippled Lehman. Lehman was now frozen out of Estate assets in Panama by an illegal Panamanian court ruling that was divested of jurisdiction.  It was a critical blow to Lehman's efforts to implement Lucom's Will. From this date forward, Lehman would have to continue his efforts to implement Lucom's Will by spending his own money, which to date has totaled millions of dollars. In addition, under Panamanian law, since Lehman had not been removed as Executor, he had the responsibility to continue to act to protect the property and could use Estate funds where available.  Lehman has faithfully complied in the name of his dear friend and client, Lucom.

**The Arias Group's Theft of Lucom's
Florida Estate Assets - The Valores Bearer Shares**

68.    At the same time the Arias Group began to corrupt the Panamanian Probate Court by illegally suspending Lehman's appointment as Executor, the Arias Group furthered their conspiracy to steal the assets of Lucom's Estate by targeting Lucom's largest Estate Asset in Florida - Valores.  Valores, whose stock was issued in bearer form, was owned by Lucom from the inception of the Company until Lucom's date of death. Valores was Lucom's "holding company" for assets located in the United States, and primarily in Florida. Lucom had lost several million dollars in a Panama Bank's failure and therefore kept the majority of his liquid assets in the U.S. Valores held nearly $6 Million in liquid assets. The assets consisted of almost $4 Million in a Florida bank deposit, a Florida

24

portfolio account and $2 Million in interest bearing Promissory Notes from Florida residents and companies.

69.     During Lucom's entire life he had always had a large office in his various homes. The office was part of Lucom's large condominium apartment in Panama, and Lucom stored his bearer shares for Valores in the filing cabinet within that office. The filing cabinet was not kept under lock and key. Upon Lucom's death, Lehman performed an inventory of Lucom's assets, and the shares in Valores were included within the Estate assets because they were present in Lucom's filing cabinet upon death.  In fact, Lehman, as the duly appointed Executor of Lucom's estate, filed an inventory with the Panamanian Probate Code which listed Lucom's assets at death.  The inventory included Valores and its assets.

70.     Hilda, however, also had knowledge of the Valores shares. In late July or early August 2006 – after Lucom's death – Hilda stole the bearer shares of Valores from Lucom's file cabinet. Rumor of Hilda's actions quickly spread, first to Lucom's secretary, Andrea Paola Ospina ("Ospina"), who noticed the bearer shares missing from Lucom's file cabinet, and then to Lehman. On August 6, 2006, both Ospina and Lehman filed reports with the Panamanian police that Hilda had stolen the Valores shares.

71.     Not deterred by the theft complaints, Hilda purported to hold a Valores shareholders meeting in Panama on August 25, 2006, at which time Hilda possessed the bearer shareholder certificates which had been taken from Lucom's office after Lucom's death. At the meeting, Hilda falsely claimed to be the sole owner of Valores. She then purportedly voted herself as the sole director of Valores. Hilda, with the assistance of the Arias Group conspirators, then sent the meeting minutes to Wachovia Bank in Florida

25

claiming to be in control of Valores in an attempt to steal Valores' $3.4 Million in the Wachovia account.

72.     Lehman soon became aware of Hilda's August 25, 2006 shareholders meeting, and in order to protect the Estate's assets, Lehman obtained an injunction in the Florida Ancillary Estate proceeding against Hilda and the Arias Group on September 21, 2006. However, a mere five days after the Florida court enjoined Hilda from accessing Valores' Florida accounts (e.g., September 26, 2006), Hilda held another shareholder meeting in Panama during which she purportedly voted to sell all of Valores' assets in the vFinance account (worth approximately $370,000)  and pay the money to a corporation named Orellana Capital Group Inc. Again, Lehman obtained an injunction in the Florida Ancillary Estate proceeding to protect the Estate's assets with respect to Lucom's Florida vFinance account on October 4, 2006.

73.     The Arias Group intended to use both the Wachovia and vFinance accounts to fund their efforts in Panama to avoid the probate of the Will, continue to extort and intimidate Lehman into resigning, and thereby assume control of the Estate. The Arias Group, however, also knew that Lehman and Ospina had filed criminal complaints regarding the missing Valores bearer shares, and quickly returned the bearer shares to Lucom's filing cabinet to mislead the Panamanian police.

74.     Thus, when Panamanian detectives performed a search of Lucom's house on October 5, 2006, they reported that the bearer shares to Valores were in Lucom's filing cabinet- where he left them at the time of his death. Shortly thereafter, the Panamanian police closed their investigation of Lehman and Ospina's criminal complaints.

**The Arias Group Interferes With Lehman's Ancillary Estate Proceeding in Florida by
Initiating the Surcharge Action**

75.     With the Arias Group's illegal "suspension order" in place in Panama, the
Arias Group took a parallel track in Florida to thwart Lehman's efforts to serve as Executor
of Lucom's Estate. On October 12, 2006, the Arias Group filed a petition to revoke the
Letters of Administration issued to Lehman in the Florida Ancillary Estate proceeding, and
filed a surcharge action in the proceeding where they falsely contended that it was wrong
for Lehman (as the Florida Ancillary Executor) to defend Lucom's Will in Panama with
money from Lucom's Florida Bank account (the "surcharge action"). In addition to the
Arias Group's submission to the jurisdiction of Florida in the surcharge action, Ramos and
the Infante Firm also appeared multiple times to assist the Arias Group and exhort Lehman
into resigning as Executor. Ramos and the Infante Firm's presence in Florida included, but
were not limited to, an October 2006 and March 1, 2007 appearance at Hilda's depositions
in the Florida surcharge action. On January 12, 2007, Hilda, by way of Ramos and the
Infante Firm, further falsely represented to the Florida court that Panamanian law required
Ramos's representation of Hilda at these depositions.

76.     Furthermore, following the Florida court's two injunctions over Valores'
Florida assets (e.g., the Wachovia and vFinance accounts), Hilda had only one argument
left to repossess the Valores bearer shares and dissolve the injunctions–to argue that Lucom
"gifted" the Valores shares to her prior to his death. However, the court documents in the
Florida and Panama proceedings quickly dispelled this fraud.

77.     First, in the Panama court proceedings, one of the grounds used by Hilda and
her attorneys to attempt Lehman's removal as an Executor was his alleged debt to Valores,
and hence to the Lucom Estate which they argued posed a conflict of interest.  Hilda was

therefore arguing that Valores belonged to Lucom's Estate.  Hilda also testified in her deposition in the Florida surcharge action that Valores was an Estate asset.  Second, in the British Virgin Islands, Gilberto swore an Affidavit claiming Lehman had the same conflict of interest and thereby conceding Valores belonged to the Lucom Estate.

78.     Further, in Hilda's deposition testimony in the Florida surcharge action, Hilda did not know the date on which she was allegedly "given" this gift. Similarly, Hilda could not remember the place in their home in which she purportedly received the gift. Hilda admitted she never kept the shares for even a moment. Hilda by her own admission never had dominion and control over the Valores bearer shares on Lucom's death. According to Hilda herself, Lucom put the bearer shares back in Lucom's files after allegedly telling Hilda they were a gift to her. Hilda has no written record of a gift nor did Lucom tell anyone of the alleged gift. Finally, Hilda's own son, Gilberto, has stated that he, not Lucom, gave the shares to Hilda from Lucom's files after Lucom's death.

### The Arias Group Raises the Ante and Begins a Campaign of False Criminal Accusations that Paint Lehman as a Murderer and Gang Leader

79.     With an illegal "suspension" order in place in Panama, and the surcharge action underway in Florida, the Arias Group started the corruption of the Panamanian criminal courts in their attempt to remove Lehman as Executor of Lucom's Estate through intimidation and strong arm tactics in order to steal millions from the Foundation. The support of corrupt judges and prosecutors provided the RICO Defendants with the foundation for their criminal scheme. Through the conduct of the criminal enterprise, the Defendants set about to manufacture false evidence, false expert testimony concerning Panamanian law, and false criminal charges that they would repeat in every media outlet, before the Courts in Florida and Panama, and with which they would seek to intimidate

Plaintiffs. All of this was done in furtherance of Defendants' scheme to steal the assets of the Lucom Estate.

80.     As with the Arias Group's plan to corrupt the Panamanian civil courts, it is also necessary to understand Panamanian criminal law in order to better comprehend the Arias' plan to abuse the Panamanian criminal courts to mislead the United States courts, Interpol agencies, and intimidate, bribe, and extort Lehman in a concerted effort to coerce him to resign in favor of Hilda as the universal heir of Lucom's Will.  Under Panamanian law, a private citizen may commence a criminal action against another person by filing a "Denuncia" with any prosecutor's office. The person initiating the Denuncia may call for the arrest and pretrial detention of the accused and for the seizure of the accused's assets. This is all based on minimal evidence, much less than probable cause. Although a Denuncia cannot proceed forward until reviewed by a Panamanian prosecutor and judge, it can, and in the instant case has been, used by powerful people such as the Arias Group to extort and intimidate others. Here the Arias Group used the Denuncia in order to achieve the self-serving personal goal of hampering Lehman's efforts to provide for the poor children of Panama in accordance with Lucom's Will.  These criminal Denuncias caused Lehman to spend millions defending himself from false charges that could imprison him in a foreign country for years.  Hilda's plan, commenced by Infante and Ramos, included the instigation of multiple baseless Denuncias, criminal investigations and arrest warrants in Panama and the United States against Lehman, and Lehman's attorneys.

### False Murder Charge (Denuncia 1)

81.     The first of these false Denuncias was filed by Infante, the Infante Firm, and Ramos on September 11, 2006, shortly after Lehman's appointment as Executor, and

accused Lehman and Ruddy of the murder of Lucom.  This was filed despite the fact that no evidence whatsoever existed that such a crime had been committed.  Ironically, the basis of Infante's charge was that Lehman murdered Lucom because Lehman sought to move Lucom to a better hospital, a John Hopkins affiliated hospital in Panama, which was by the Infante Firm's own allegations – pursuant to Lucom's wishes and power of attorney.

**False Gang and Theft Charges (Denuncia 2) and False Swindle and Theft Charges (Denuncia 3)**

82.    In a separate complaint filed on the same day as the murder complaint, (September 11, 2006) the Arias Group, through the Infante Firm (purportedly on behalf of Hilda), filed a second Denuncia against Lehman which together with the first Denuncia portrayed Lehman as a murderer of a dear friend and client, Lucom; and as a thief who committed such a murder in his capacity as a leader of a criminal gang intent on stealing Lucom's money. Specifically, the second Denuncia falsely charged Lehman, Crosbie, Ospina and others with: (1) aggravated assault; (2) forgery of documents; (3) illegal exercise of a profession; (4) unlawful association to commit crimes; (5) perfidy; (6) falseness; (7) aggravated swindle; and (8) fraud.

83.    Moreover, the second Denuncia was more than an attempt to intimidate Lehman. Again showing Infante's power and the undue influence his clients were able to exert over Panama's prosecutorial branch, on September 10, 2007, the Fourth Circuit Prosecutor in Panama, Defendant Bernal, indicted Lehman and issued a warrant for his arrest (the "Gang Theft Warrant"). It called for Lehman's immediate preventive detention and arrest without a trial. The Gang Theft Warrant was clearly intended by Defendants to scare and intimidate Lehman and anyone else who would support Lucom's Will.

30

84.     Shortly after the second Denuncia was filed, a third Denuncia falsely accused Lehman of stealing Lucom's Estate checks. This third Denuncia falsely charged Lehman with: (1) the crime of swindle; and (2) theft.  Together, Denuncias one, two and three are a series of criminal allegations against Lehman. When the three Denuncias are taken together, it is clear that the conspiracy was to paint a false picture of Lehman, as a murdering, stealing crook so that all of Lehman's efforts to protect the Foundation and carry out Lucom's Will could be thwarted. Furthermore, the major criminal allegations were designed to set the stage for Lehman's multiple false arrests in Panama in order to intimidate or kill Lehman so that Lehman's protection of the Foundation would be abandoned.  The three Denuncias together present a wholly false version of reality and each of the three Denuncias depends upon multiple false statements of fact and law made by those responsible for the false allegations, discussed in detail *infra*.

85.     At the same time, however, these false Denuncias effectively caused Lehman to delay his duties in protecting the Estate.  They were, however, ineffective at permanently scaring or buying off Lehman, and the Arias Group realized their plan to steal millions of dollars from the mouths of the poor children of Panama would require even more extraordinary actions against Lehman.

**The Arias Group Attempts to Extort and Bribe Lehman**

86.     On November 30, 2006, Infante attempted to bribe Lehman to resign from office with an offer of $3 Million cash. In response, Lehman filed a criminal complaint against Infante the following day on December 1, 2006 and testified before the 15th District Court of Panama's First Judicial Circuit, with the purpose of informing the Prosecutor, among other crimes, of Infante's bribery attempt:

> . . . just yesterday Hector Infante offered me three million dollars if I resign. This happened in a meeting in which I was present as well as Octavio Del Moral, attorney Mario Boyd, attorney, Hector Infante and one of Hector's associates whose name I do not know, this happened yesterday Thursday, November 30 in a restaurant near Infante's office.

Further, Infante's $3 Million bribery offer was not a bona fide settlement of lawsuits, but instead was to force Lehman to resign as Executor to allow the Arias Group to steal the Lucom Estate Assets, and avoid the funding of the Foundation.

87.     Prior to this, the Arias Group also attempted to bribe Ruddy, and offered to forgive Ruddy's $1.5 Million debt to Valores and to drop the murder and gang charges against Ruddy, in exchange for Ruddy's cooperation with the Arias Group. Shortly thereafter, all remaining charges against Ruddy in Panama were dropped.  Having been co-opted by the Arias Group and their co-conspirators, Ruddy has refused to communicate with Lehman since that time, and has refused to provide meaningful testimony in support of Lucom's intentions in his Will, including Lehman's appointment as Executor. From here, the Arias Group knew that Lehman was the sole obstacle in their plan to steal Lucom's Estate.

88.     To prevent the Arias Group from continuing their onslaught, in January 2007 Lehman, not on behalf of the Estate but rather in his individual capacity and on behalf of Lehman, P.A., filed an abuse of process and civil conspiracy action in the Circuit Court for Palm Beach County against the Arias Group, Infante, Ramos, and the Infante Firm. However, Lehman's attempt to curb the Arias Group's illegal actions against Lehman and his law practice were futile, as the Arias Group, Infante, and the Infante Firm, evaded service of process, and were ultimately never served in this action.

### The Arias Group Suffers a Temporary Set Back – The Panamanian Superior Court Dismisses Lehman's Murder Charges.

89.     On March 9, 2007—nearly a year after the false murder charges were brought, the Second Superior Court of Panama and the Prosecutor presiding over the murder allegation (first Denuncia) against Lehman thoroughly investigated the First Denuncia and closed the file dismissing the charges against Lehman. Particularly, the Court stated:

> According to the court the elements summarized allowed it to deduct that the death of Mister Wilson Charles Lucom resulted from adverse pathological circumstances and is not a product of the intervention of a criminal fraudulent or punitive act . . . by Richard Lehman . . . it is important to underline the sworn declaration of physician Marco Antonio Lopez Zamora in which he states that **the patient was never unattended, disconnected was never taken off any medical support, always remained in the same bed with all the life support machines and medicines that he was taking**.

90.     In addition, Hilda's own testimony on March 1, 2007 in the Florida surcharge action provided that Hilda is not the real party accusing Lehman of the murder of Lucom. Rather, the real accusers making the false accusation against Lehman are the other members of the Arias Group, Infante, Ramos and the Infante Firm.  In fact, it is clear from Hilda's own testimony in the Florida surcharge action that she never believed in the Denuncia filed in Hilda's name by Ramos and the Infante Firm. Hilda also testified that she never authorized the first Denuncia accusing Lehman of being a murderer.  Hilda, moreover, never knew the case filed by her against Lehman for murder was dismissed.

91.     However, the dismissal of Infante's murder charges against Lehman did not deter the Arias Group. From here, the Arias Group doubled their efforts in the Panamanian criminal courts to defraud the United States Interpol agencies by obtaining orders calling

33

for the arrest of Lehman, and to intimidate, bribe, and extort Lehman in a concerted effort to coerce him to resign in favor of Hilda.

### The Arias Group Suffers Another Set Back –The Intermediate Level Appellate Court Uphold's Lehman as an Executor

92.     On May 4, 2007, the Panamanian Superior Court (intermediate level Appellate Court) upheld the original Panamanian Probate Court ruling (Order 1025) and held that Lucom's Will was valid. The Court further ruled that the appropriate administration of Lucom's Will should in fact be carried out by the three Executors named in the Will: Lehman, Hilda, and Ruddy. The Superior Court's order also provided that the three appointed Executors and trustees of the Estate "must appear before the Court in order to be installed in office [e.g., take an oath]." Lehman, however, was the only Executor to go before the court to take the oath. Hilda refused to take an oath and instead appealed the Superior Court Order to the Panamanian Supreme Court –the highest court in the land.

93.     Lehman and one of his Panamanian attorney's, Octavio Del Moral ("Del Moral"), then opened negotiations with several of Panama's leading charities, including but not limited to, Hogar de San Jose de Malambo, and Nutre Hogar. The promise had been made to give these charities a fixed percentage of whatever was eventually awarded by the Panamanian courts or obtained through a settlement. The total of the promised percentages would eventually equal 100% of the awarded amount.

94.     However, because of the Arias Group and other co-conspirators actions, the agreement with the charities was never executed. On or about February 6, 2009, Melinda and Infante made numerous personal threats to the various charities involved, warning them that if they accepted the agreement for charitable funds from Lucom's Estate, the charities would be harmed by the "Panama America" Newspaper, a daily newspaper of

general circulation in Panama, with a corresponding website that is circulated in Florida and throughout the world, and that until recently was owned and controlled by the Arias Group and their family. Melinda and Infante threatened the charities that they would never be able to raise funds again from the Panama elite if they agreed to accept any funds from the Lucom Estate. To date, the charities have refused to accept the funds out of fear and thuggish intimidation tactics employed by the Defendants.

### Order Appointing Illegal Administrator – Order 229

95.    Moreover, as if the Arias Group's previously obtained illegal suspension Order was not enough, in the wake of the Superior Court's ruling appointing three Executors to Lucom's Will, including Lehman, on November 21, 2007, Judge Molina of the Fifth Circuit, at the request of Infante, appointed Defendant Marta Lucia Cañola ("Cañola") as the administrator of the Testamentary Succession of Lucom (hereinafter "Order 229"). To obtain Order 229, Infante had falsely represented that a conflict of interest existed with the presiding Fourth Circuit Judge who originally appointed Lehman executor, and the probate proceeding was transferred to the Fifth Circuit and Judge Molina – who Infante and the Arias Group had corrupted and used as a conduit in furtherance of the RICO Defendants conspiracy. Under Panamanian law (which unlike in the United States where there is a blind case assignment), a reassignment of a case goes to the next Judge in numerical sequence. This ensured that each new filing brought before the probate court would be heard and ruled upon by Molina.

96.    As with the suspension Order, Judge Molina had been divested of jurisdiction by the appeal, but nonetheless appointed an illegal administrator to further hamper Lehman's efforts to serve as Executor of Lucom's Will and to allow for the

eventual theft of Estate assets by Molina, Cañola and Arias Group. In ultimately overruling Order 229, Superior Court Judge Cal stated "the executor is designated by the decedent in his will and, therefore, is present only in testamentary estates." Judge Cal further stated on the improprieties of the Probate Court that "the [Probate] Judge appointed Richard Sam Lehman as executor . . . [and] the lower court judge can do nothing related to the matter of the executor . . . ." In a separate Order Judge Cal again reflected on the improprieties of the Probate court and stated "the Fifth Court was not competent to decide on the administration of the estate."

### False Charge of Stealing Lucom's Estate (Denuncia 4)

97.    The Superior Court's ruling upholding Lucom's Will and appointing Lehman Executor, did not deter the Arias Group's efforts to get rid of Lehman and loot the Estate's assets. From here, Infante restarted the onslaught in the Panamanian criminal courts with even more vigor, when Infante's law partner, Ramos, filed a criminal complaint against Lehman, Lehman's Panamanian attorney Victor Crosbie ("Crosbie") and others, accusing said individuals of committing crimes against the property and legal authority of the Lucom Estate.

98.    On October 31, 2007 Defendant Bernal enclosed an official indictment of these charges and asserted that there was evidence (when there was none, *see infra*, ¶110) of the commission of a crime against the legal authority of the Lucom estate, and further crimes against the property of the Lucom Estate.

### False Extortion Charge (Denuncia 5)

99.    In just over a month prior to Bernal's indictment, moreover, the Infante Firm, purportedly representing Infante, filed a criminal complaint against Lehman for extortion,

defamation and slander on August 28, 2007.  Infante's criminal complaint was based upon privileged statements made by Lehman in response to questions from Hilda's attorneys in depositions in Lehman's surcharge action in Florida, and an email sent by Lehman to Infante to promote an amicable settlement for the Estate.

100.   As shown in the Panama Supreme Court opinion that dismissed this illegal indictment, on the basis of Infante's criminal complaint, the Arias Group was able to obtain an immediate illegal arrest warrant and an illegal indictment against Lehman for the crime of extortion without any investigation whatsoever from the Prosecutor Parodi who had (1) no jurisdiction over the case; (2) violated all of Lehman's constitutional and judicial protections that go with the presumption of innocence in the Panama Constitution; and (3) brought charges when in fact there was no crime. Thus, the Supreme Court ruled

> in the Court's judgment . . .the factual and legal bases in support of the preventative detention order against RICHARD SAM LEHMAN . . . are not sufficient to establish there is a crime . . . and [we] declare[] the preventive detention [of Lehman] illegal.

### The Arias Family Newspaper Starts an International Slander Campaign Against Lehman

101.   The Arias Group knew the plan would not work without destroying Lehman's reputation.  In order to spread the lies created by the false Denuncias about Lehman through Panama, the United States, and the world, the Arias Group used their family controlled newspaper and second largest newspaper in Panama, "Panama America" as a means to further hamper Lehman's efforts from serving as Executor for Lucom's Will.

102.   On September 12 and 13, 2007, Panama America published two articles reporting that Lehman and Crosbie were charged with Fraud, document forgery, illegal practice of law and illegal association to commit offenses. These two articles, entitled

"Indagatoria contrasujeto que se hizo pasar por abogado" and "Ordenan captura contra supuestos abogados," respectively, were published and circulated in Florida, Panama and throughout the world on Panama America's website. These articles falsely stated that Lehman was fleeing arrest for numerous crimes and the illegal practice of law. The articles contained significant false statements of fact which tend to expose Lehman and Lehman, P.A., to hatred, ridicule and contempt and also damaged their business and reputations.

103.    To combat the Arias Group's slanderous media campaign, Lehman, not on behalf of the Estate but rather in his individual capacity and on behalf of Lehman, P.A., filed a defamation suit against Panama America in the Circuit Court in Palm Beach County on October 11, 2007. Panama America, however, evaded service of process and continued their slander campaign against Lehman, and Lehman, P.A.

104.    For instance, as soon as the illegal arrest warrant was issued on the fourth Denuncia, on December 12 and 13, 2007, the Panama America newspaper published two articles falsely reporting that Lehman was charged with a multiplicity of crimes in Panama. These two defamatory articles were published and circulated in Panama and in Florida on Panama America's internet website. The owners of the Panama America newspaper at the time included Defendants Gilberto and Melinda and other close family members of Hilda and her children. These articles were placed in the family's newspaper, Panama America, by the Arias Group who were bent on stealing the Estate's assets and set about to destroy Lehman's credibility countrywide, and worldwide as part of the plan to remove Lehman as Executor.

105.    Among numerous other falsehoods, the articles falsely stated that Lehman faced manslaughter charges and was fleeing arrest for numerous crimes and was engaged in

the illegal practice of law. The articles also falsely stated that Lehman was a fugitive from justice. The articles contained significant false statements of fact which tended to expose Lehman to hatred, ridicule, and contempt and also tended to expose Lehman to damages for his business and reputation. The articles also falsely charge that Lehman committed the crime of murder, which had already been dismissed by the Second Superior Court at the time of the article's posting. These articles were part of the RICO Defendants' master plan designed to spread false information about Lehman and his supporters regarding Lehman's status as Executor. All of this was done in furtherance of the scheme to coerce Lehman into "giving up" and, if he refused to give up, make it impossible for Lehman to protect the Estate's assets against the Defendants.

106.    The Arias Group's use of their captive media outlets to attack and intimidate Lehman raised the ante, because the criminal conspiracy in Panama was now aided by the Panamanian press and media. There are numerous protections under Panama laws that protect an accused's identity prior to conviction. None of these protections were honored by the Arias Group and their Panama America Newspaper. Lehman could not travel to Panama for fear of his life and freedom, much less to fulfill his duties as the Executor of the Lucom Estate.  This slanderous campaign has continued throughout the years and as recently as 2010 when the Arias Group, through Hilda and Sidney Sitton, published two articles in the Panamanian newspaper, La Prensa, which falsely depicted Lehman as a fraud.

**Infante Files Yet Another False Criminal Complaint to Shut Down Lehman's United
States Based Law Firm Website and United States Based Website which Published
Lehman's Efforts to Provide for the Poor Children of Panama.**

107.    Around this time, Infante also filed a complaint with the Panamanian
criminal courts to shut down Lehman's United States based website, www.lucom-
ninospobresdepanama.com, which published Lehman's efforts to provide for the poor
children of Panama. As the Arias Group knew, because Lehman's "ninospobresdepanama"
(i.e., poor children of Panama) website was also linked to his law firm website, shutting
down "ninospobresdepanama" would shut down Lehman's lawfirm's website too. The
basis of Infante's Complaint was a report attached to Lehman's website which contained
excerpts of Lehman's deposition transcript in the Florida surcharge action. This was the
same report that was the basis of Infante's extortion and slander charge against Lehman,
which had already been dismissed by the Superior Court (*see infra,* ¶ 123).

108.    On June 16, 2008, the Thirteenth Criminal Circuit for the First Judicial
Circuit of Panama denied Infante's motion to shut down Lehman's website. Infante
appealed the criminal court's decision. Lehman was unaware both of Infante's request to
shut down the website and his appeal of the criminal court's denial of his motion, because
Infante intentionally failed to serve Lehman's attorney in Panama with notice of Infante's
appeal. Lehman, therefore, was not given an opportunity to appear and participate in any
part of the proceeding, including the appeal.

109.    As Lehman would only later discover after he unsuccessfully attempted to
view his law firm website, on February 27, 2009, the appeal was heard by the Second
Superior Court which reversed the criminal court and ordered the seizure of Lehman's
websites.  Fortunately, Lehman was able to convince his website server to allow Lehman

temporary access to his websites in order to mitigate the damage to Lehman's law practice, which had been disrupted due to Infante and the Arias Group's efforts.

### Lehman is Vindicated From Each False Criminal Charge –But Infante and Bernal's Corruption Lead to Crosbie and Lehman's False Arrests

110.   With the prior background of each Denuncia filed against Lehman, Crosbie and others, the Arias Group's plan to thwart Lehman's efforts to provide for the Foundation and mislead the Florida courts was being carried out ruthlessly and relentlessly. As with the first Denuncia, after a thorough investigation, the second, third and fourth Denuncias were also ordered dismissed by the Panama Superior Court on November 21, 2007:

> . . . the court does not perceive evidence of the crime . . . and . . . the authority who has issued the arrest warrant in the case of Mr. Richard Lehman has not fulfilled his requirements as set forth in Article 21 of the National Constitution, as well as requirements in Articles 2140 and 2152 of the Judicial Code . . . .

111.   However, again there is even more convincing evidence that there was no "gang" or plan by Lehman to steal Lucom's Estate. Hilda's own testimony in the Florida surcharge action established that, like the first Denuncia, Hilda had no idea why the second, third or fourth Denuncias were filed (purportedly on her behalf), what they said or that they were overturned. In two separate statements made under oath in the Florida surcharge action, Hilda did not present any evidence to support any Denuncia. Indeed, Hilda testified that she had no facts to support the "Gang" Complaint, which called for Lehman's imprisonment for five to ten years in advance of trial.

112.   To understand how totally corrupted Prosecutor Bernal was by the Arias Group it is important to look at Bernal's actions in charging Lehman with the fourth Denuncia and the illegal arrest warrant that resulted from the illegal charge. The fourth

Denuncia was actually an extension of the second and third Denuncias. Bernal, however, ultimately was unable to continue to use the second and third Denuncias to prosecute Lehman or his chief Panamanian advisor, Crosbie, since Bernal's jurisdiction had been removed to the 7th Circuit Court for her failure to timely close the case.

113.    Thus, Infante filed a complaint against Lehman (and Bernal issued the indictment and arrest warrant) for the alleged crime of illegally spending Estate money and an arrest warrant was issued for his arrest. However, it was critically important to the RICO conspirators at this point, as the Panamanian criminal courts continued to dismiss the false criminal charges, to arrest Lehman or his chief advisor, Crosbie, in order to further intimidate, coerce and put fear into both Lehman and Crosbie to discontinue their efforts on behalf of the Estate and the Foundation.

114.    Therefore, the legal traps set by the RICO Defendants against Lehman became even more intense. Lehman was charged with the fourth Denuncia for allegedly illegally spending Estate money and an arrest warrant was issued for his arrest. The Prosecutor's Office of the Fourth Prosecutor issued arrest warrants based on obviously false facts. Prosecutor Bernal claimed that a crime had been committed when Lehman paid Estate funds to third party service providers such as lawyers and other professionals to defend Lucom's Estate against the RICO Defendants efforts to steal the Estate assets. Bernal issued an arrest warrant for Lehman even though six months prior, Lehman made a special appointment with Bernal and flew to Panama for a meeting. Lehman demanded that Bernal permit him to testify and clean up the false statements in the charges against him in the "gang complaint." Lehman's demand to testify under oath was repeated several times in

42

the Prosecutor's office in Panama in front of at least two witnesses, the Executor's counsel and an interpreter.

115.    Prosecutor Bernal, however, refused to hear Lehman's testimony or see his exculpatory testimony. Bernal instead issued an arrest warrant even though Lehman had been appointed the Executor by the Probate Court, confirmed by the Superior Court, and was required under Panamanian law to use Estate money to defend the Estate. Had Bernal taken Lehman's timely testimony when offered, Bernal would have learned that Lehman, as the Executor was instructed by a written legal opinion from the law firm of IGRA, one of Panama's most respected law firms, that he had a continuing obligation to protect the Estate and was obligated to use Estate money to do so.

116.    The Prosecutor issued an arrest warrant for immediate incarceration claiming Lehman misused Estate funds even though the funds were paid on behalf of the Estate to professionals necessary to successfully defend the Estate and Lehman received no personal remuneration. The Prosecutor considered the payments to defenders of the Estate a crime. Ironically, as Lehman would have testified were he permitted by Bernal to do so, by the time of the arrest warrant, Lehman had spent $700,000 of his own personal money to defend the Estate and had received no personal benefit whatsoever. By April of 2008 Lehman had spent $1.2 Million of his own funds to defend the Estate.

**Bernal and Infante Send False Interpol Red Notice Alerts to the United States and 170 Other Countries Around the World Calling for the Immediate Arrest of Lehman and his Attorney Crosbie**

117.    Following Infante's criminal complaints against Lehman, Crosbie and others, accusing said individuals of committing crimes against the property and legal authority of the Lucom Estate, on September 10, 2007, Prosecutor Bernal issued official document No.

3745 addressed to Jose Ayu Prado, who was the Director of the Judicial Technical Police, the director of the National Migration Administration and all security bodies, ordering the arrest of Lehman, Crosbie and others. Worse, on October 24, 2007, Infante faxed Bernal's letter to NCB Interpol Panama who, as part of the conspiracy with Infante and the Arias Group, issued a Red Notice alert to more than 170 countries worldwide, including the United States. The warrant code is reserved for terrorists and drug lords, and was issued by Interpol Headquarters in Lyon, France, on the request of the Interpol liaison office in Panama based solely on Infante's fax to Bernal.

118.    On October 25, 2007, the United States Interpol office responded to the Red Notice alert by requesting more documentation regarding the request, particularly with regards to the type of criminal investigation that was conducted on Lehman and Crosbie. On October 31, 2007, the United States Interpol office in Washington, D.C., responded to Interpol Panama's supplemental documents and requested Lehman's birth date.   On October 29, 2007 a similar request was made from the Bogota, Colombia Interpol Office.

119.    By November of 2007 the Panama Superior Courts had dismissed the second, third and fourth Denuncias. Therefore, pursuant to the opinion of the Superior Court, Bernal could no longer enforce her illegally issued arrest warrant.  However, the Superior Court ruling dismissing the false charges brought against Lehman meant little to Bernal. She then showed her utter contempt for the Superior Court, the second highest court in the land, by completely ignoring the court's order of dismissal, and orders finding her arrest warrant illegal. In conspiring with Infante and the Arias Group, Bernal intentionally failed to instruct the Panama Division of Interpol of the Superior Court's dismissals of the frivolous Denuncias in order to cancel the international Interpol Red Notice Alters calling

44

for Lehman and Crosbie's arrest. This was all done with the intent to isolate, coerce and intimidate Lehman, and further interfere with Lehman's efforts to protect the Estate and further Lucom's intentions under the Will.

120.    Three months later, on January 26, 2008, the illegally issued arrest warrant was overruled but still not corrected by Prosecutor Bernal with the Panama police.  At that time Crosbie flew from San Jose, Costa Rica, to Medellin, Colombia, where he was arrested at gun point by Colombian authorities pursuant to the false Red Notice Interpol warrant. After arresting Crosbie at the Medellin Airport, Columbian police deported him that same evening to Panama, where he was arrested and taken to Panama Police headquarters.

121.    That same day (January 26, 2008), following an internal investigation within Interpol Panama, inspector Marta Gonzalez, Chief of Panama Interpol National Central Bureau issued a letter to Prado stating, "Director, to date [e.g., three months after the Superior Court dismissed the frivolous Denuncias] this office has not receive information related to the CEASE order for Mr. Victor Crosbie, which was issued by the Second Superior court . . . dated November 23, 2007."  It was not until January 31, 2008 that Maria Cecilia Mata Alvarez, General Secretariat of the Judicial Technical Police, issued a certificate stating that Lehman and Crosbie were cleared by Panama's Interpol.   The incident attests to the Arias Group's power to manipulate the judicial and law enforcement authorities of Panama, and through them Interpol in the cause of frustrating Lucom's Will and looting the Estate.

**Lehman is falsely arrested in Panama to prevent Lehman from defending himself at trial in the Florida Surcharge Action and Thwart Lehman's Efforts to Administer Lucom's Will.**

122.    By February 2008, Infante had another weapon to continue to use to prevent Lehman from defending himself and the interests of the poor children of Panama. This was the alleged extortion charge brought by Infante.  In spite of the fact that Lehman had overcome four separate Denuncias of crimes against him, the Arias Group were still not finished with their criminal scheme.

123.    On October 8, 2008, the last of the Defendants' false Denuncias had been dismissed against Lucom, Crosbie and others, when the Supreme Court of Panama, *en banc*, ruled that there was not sufficient evidence to establish that Lehman committed the crime of extortion, defamation, and slander, and therefore declared the preventive detention order (e.g., arrest warrant) on Lehman to be wholly illegal. Only now, after having all five of the Defendants' false Denuncias disposed of in the criminal courts of Panama, which the Arias Group successfully delayed and multiplied, did Lehman find it safe to go back to Panama to continue his duties as Executor of the Estate.  As such, on January 21, 2009, Lehman flew to Panama to hold a press conference announcing a new "united fund" of charities to fulfill the requirements of Lucom's Will. This alliance of Panamanian charities was an important step in distributing the money from the Lucom Foundation to the poor children of Panama.

124.    On February 6, 2009 Lehman returned to Panama to meet with the charities and legal counsel. On that same date, as Lehman was about to return to Florida to defend himself at the trial in Florida in the surcharge action brought by the Arias Group (which was specially set for trial later that month), Lehman was pulled off his return flight to the

United States by immigration officials. According to the immigration officials, orders had been received (since Mr. Lehman's last visit to Panama fourteen (14) days prior) to detain Mr. Lehman based on the Extortion/Defamation Warrant, which as explained above, had been declared illegal by the Supreme Court of Panama on October 8, 2008. Lehman was taken into custody by the Panamanian Police Department.  Lehman's attorney stayed by his side all night for fear that he would be transferred from jail to jail until he ultimately disappeared.   To carry out the criminal conspiracy of the Arias Group, Panama's law enforcement system abused its authority and arrested Lehman to intimidate Lehman and Panama's supporting charities, and prevent Lehman from appearing at trial in Florida for the surcharge action specially set for later that month.

125.    On February 7, 2009, in order to free Mr. Lehman from the Panama Police, the new Fourteenth Prosecutor, Defendant Parodi sent a letter to the Panamanian National Police revoking the arrest warrant. Parodi admitted that "the Second Superior Court of Justice, by way of official document No. 5668-S, dated December 10, 2008, notified him of the judgment by the Supreme Court of Justice en banc that declared the detention of Mr. . . . Lehman illegal."  Lehman was held by Panamanian police for nearly 15 hours on February 6, 2009 until Parodi finally and reluctantly informed the police of the Supreme Court's habeas corpus order freeing Lehman.

126.    At the Arias Group's direction, Prosecutor Parodi, however, refused to clear Lehman with the Panama Immigration authorities. In order to leave the county, therefore, Lehman had to request the Clerk of the Supreme Court to issue a letter to the National Immigration Services stating that the Court had declared the arrest warrant illegal. That letter was issued on February 9, 2009.  Lehman had been precluded from leaving Panama

for an extra two days while he obtained an immigration clearance that should not have been required of him and should have been granted two days earlier.

127.    Almost comically, again on February 9, 2009, Lehman boarded a plane to return to Florida, and a new detention order had been received by the immigration authorities. This was based on "gang" and "theft" charges (e.g., Denuncias two and three), which as explained above, had been declared illegal on November 21, 2007 by the Panamanian Superior Court.  This time Fourth Prosecutor Bernal refused to nullify the arrest warrant despite the order from the Superior Court. Despite the Superior Court's ruling, Circuit Judge Dianna Hurtado also refused to nullify the arrest warrant. Lehman had to petition the same Superior Court for assistance. As a testament to the Arias Group's power and influence,  Lehman may be the only defendant in Panamanian legal history that was required to submit two habeas corpus petitions to free him from arrest warrants on the same false charges.

128.    On October 14, 2010, the Panama Supreme Court issued Lehman's second habeas corpus ruling on Prosecutor Bernal's illegal indictments.  After admonishing both the Prosecutor and the lower court that wanted to keep Lehman illegally locked in the country for over a year, the Supreme Court "Declared illegal the preventive detention and the prohibition from leaving the country imposed upon Richard Sam Lehman."

129.    Bernal and Parodi conspired with the Arias Group to coerce and scare Lehman, and intimidate the Panamanian charities from dealing with Lehman in Lehman's attempts to further the intention of Lucom's Will and provide for the poor children of Panama. By repeatedly falsely arresting Lehman, the RICO Defendants continued to hinder

Lehman's efforts as Executor, continued to slander Lehman's name, and continued to hurt the poor children of Panama.

### A Murder Attempt on Lehman's Ally

130.    Hector Avila ("Avila"), a Panamanian talk radio host who informed the Panamanian people about the Arias Group's attempts to steal the Lucom Estate through abuses of governmental authority, led a march on the Supreme Court demanding justice for the poor children of Panama in late December, 2008.  The following week, on November 4, 2008 Avila was shot through his jaw by an unknown assailant. Indeed, the Panamanian Newspaper "La Estrella" reported the murder attempt, and authored the article "Three gang-member 'hitmen' tried to end leader Hector Avila's life on the Plaza Amador grounds in El Chorrillo." Under the Article's subheading entitled "Lucom's Estate," La Estrella stated that Avila "has undertaken a new fight [e.g. to report the Arias Group's corruption against the Estate of Lucom]… it is perhaps the most dangerous and difficult, and it could cost him his life."

### The Arias Group and its Fraud on the Florida Court in the Florida Surcharge Action.

131.    It was by absolute design and no accident that Infante arranged to have Lehman falsely arrested twice in Panama in early February of 2009.  In Florida, the trial in the surcharge action was specially set for February 2009. To interfere with this trial, Judge Molina, who was still sitting on the bench in spite of an indictment for selling judicial favors in another case, upon Infante's improper Motion, influence and corruption, entered another Order designed to continue to tie Lehman up as the Executor (since that had already been accomplished with the Judge's appointment of the illegal Administrator of Lucom's Estate).  The Probate Court issued, in response to a request for a Motion by

Infante, the fatal order that was introduced in the Florida Probate Court that falsified the state of the law in Panama regarding Lehman's appointment as Albacea.

132.   Judge Molina's Order 952 held that Lehman's appointment as personal representative in Panama was a nullity. At the surcharge trial, the Florida court then relied upon Order 952, and the false expert testimony (which in truth was inaccurate opinion testimony) of Panamanian attorney Ruben Rodriguez Avila ("Rodriguez Avila") that the Panamanian probate court's order appointing Lehman as Albacea in Panama was "automatically and immediately null and void when Hilda P. Lucom filed her appeal of that Order," and that "Lehman was not installed or properly serving as Albacea of the Panamanian Estate."

133.   Order 952, as Infante, Rodriguez Avila and Judge Molina well knew, was an unauthorized Order under Panamanian law, and Judge Molina issued the Order after he *knew* he was divested of jurisdiction. Judge Molina clearly understood this because the Superior Court's May 4, 2007 ruling finding for three executors was on appeal to the Supreme Court, the probate court was divested of all jurisdiction to hear matters related to the Executor. For instance, on July 10, 2009, on Ruddy's motion to be recognized as a legatee and executor under Lucom's Will, Judge Molina *denied* his motion by stating the appeal of the Superior Court's May 4, 2007 ruling, created "a situation that prevents the Court presiding over the matter from deciding on any motion related to the said succession [proceeding]." The corrupt nature of Molina's ruling in Order 952 is further evidenced on October 12, 2009, when the First Superior Court made it clear that Judge Molina's Order 952 lacked legality. It ordered Judge Molina "to forward to this office the proceedings or,

alternatively, a report on the facts that are the subject of the action within two (2) hours following receipt of the present request for production," closing with this decree:

> You are also advised that Order No. 952, dated August 29, 2008, issued by the Fifth Civil Court of the First Judicial Circuit in the testate estate proceedings of Charles Wilson Lucom has been stayed.

134.   The First Superior Court further confirmed that Order 952 was not a final nullification when it dismissed its October 9, 2009 Order because appellate review other than constitutional writ review was available: "As was shown, available still is the procedure established by procedural rules to Appeal Order No. 952 issued on August 29, 2008; that court order is not yet final or firm, which implies there is the underlying possibility of a review of its lawfulness within the regular jurisdictional level."

135.   That is, Hilda's appeal of the Superior Court's Order finding for three Executors (including Lehman) was on review to the Supreme Court of Panama, and Order 952, the purported nullification of Lehman's appointment, remained suspended, until the Supreme Court's 2011 ruling, without force and effect.  Unfortunately, the corrupt Order 952 was not overruled prior to Hilda and the Arias Group's introduction of Order 952 at trial in the Florida surcharge action.  This resulted in a judgment against Lehman based upon the Arias Group's conspiracy to provide false evidence to induce the Florida judge to rule against Lehman.  The action in Florida was held to determine the correctness of Lehman's expenses. Lucom's Will provided that Lehman, as his Executor, could only be responsible for the following circumstances: "Each individual Executor or Trustee <u>must not be subject to any legal liability</u> for any action omission or loss in connection with the administration of this estate, <u>except for fraud or theft, or any other crime</u> committed against the assets of the Wilson C. Lucom Trust Fund Foundation." It was obvious, Lehman had

not breached this standard, and Infante and the Arias Group needed another way to win in Florida –they found it with Judge Molina and Order 952.

136.    On March 3, 2009, the Florida Judge, relying on the illegal Order No. 952, and false expert testimony regarding Panamanian Law, found that Lehman had no authority as the appointed Panama Albacea, that Lehman was a fraud and was so incensed by this perceived fraud on the Florida Court that he "threw the book at Lehman."   The first paragraph of the Judgment tells it all:   "Unequivocal evidence [e.g., corrupt Order No. 952 and Rodriguez Avila's false opinion testimony] received at trial proved that July 5, 2006 Panama Order appointing Lehman "Executor" of the domiciliary estate was automatically and immediately null and void when Hilda P. Lucom filed her appeal of that Order on July 18, 2006.  . . . [Therefore] at all times material to the action before this court, Lehman was not installed or properly serving as the Albacea of the Panama Estate."

137.    The "unequivocal evidence" was the corrupt Order No. 952.  The cornerstone of the Florida Judgment was based upon the Florida Court's erroneous interpretation of Panama law and the illegal Order No. 952.  After Lehman received the Florida Judgment and knowing it was based on a corrupt Panama ruling, Lehman returned to the Panama Courts and received the proper clarifications of Panama law by virtue of the August 12, 2009 opinion of the Panama Superior Court and several subsequent court orders and rulings.

138.    However, the Florida Judgment and the Arias Group's onslaught of illegal actions took their toll on Lehman. Lehman's 42 year reputation for excellence was ruined by a false filing that Lehman had fraudulently represented himself to the Florida court.  In addition to the ruined reputation was a ruined law practice and Lehman facing bankruptcy.

Lehman's bleak financial situation caused by the Arias Group's corruption, extortion, and fraud, caused Lehman to drop his defamation lawsuit in Palm Beach County against Panama America on May 12, 2009. Similarly, the Arias Group's corruption, extortion, and fraud, caused Lehman to dismiss his abuse of process and civil conspiracy claims with prejudice in December 2009.

139.    To make matters worse, even after Lehman presented the Florida Court in the surcharge action with the Panamanian Superior Court Judgments that overturned the corrupt Order No. 952, the Arias Group's slander campaign against Lehman still marred his reputation. Upon Lehman's Motion for Rehearing and New Trial and Motion to Alter or Amend Judgment (the "Motion"), the Florida court, after seeing the "newly discovered Panama evidence," ruled on the key question of Lehman's authority under Panama law. The Florida court ruled that Lehman was the appointed and authorized Executor in Panama. The Florida court now stated:

> There is no dispute that on or about July 5, 2006, Lehman secured an order in Panama installing himself as Albacea of the Estate of Wilson C. Lucom, who died a Panama resident on June 2, 2006.  This was done even though the Will that Lehman presented to the Panamanian probate court named three persons as Albaceas: himself, Lucom's surviving wife, Hilda, and Christopher Ruddy.

Nevertheless, the Florida court was still stained by the Arias Group's conspiracy to paint Lehman as a crook and thief of Lucom's Florida Estate assets, and denied Lehman's Motion. The Court's denial is currently the subject of a pending appeal in the Fourth District Court of Appeals.

**The Arias Group Bribes the Panamanian Supreme Court Justices $1.5 Million Each to Appoint Hilda as Lucom's Sole Executor and Universal Heir.**

140.    On or about June 2008, Infante acting as an agent and conduit for the Arias Group, made their boldest move to date. Infante went to lunch at Café Marisco in Panama

53

with Justice Mitchell, and two attorneys, and offered each of the three presiding Supreme Court Justices $1.5 Million to issue an Order that named Hilda as the sole Executor and "universal heir" of Lucom's Estate. The Justices complied.

141.    On August 6, 2010, in consideration for Infante's $1.5 Million bribe to each of the three Panamanian Supreme Court Justices presiding over Hilda's appeal, the Supreme Court of Panama issued the indefensible decision that repudiated Mr. Lehman's status as Executor –and that of Ruddy as co-Executor –and nullified Lehman's efforts since July 2006 to carry out his professional duty to defend the Will and implement its provisions. The Supreme Court of Panama upheld the validity of Lucom's Will, but then completely rewrote its provisions. The Court retroactively replaced Lehman—the Will's only defender and Executor –with Defendant Hilda, thereby effectuating the Arias Group's conspiracy to take for themselves the entirety of the Estate. In spite of all of the written words in Lucom's Will, the Panama Supreme Court named Hilda as the sole Executor and "universal heir" of the Lucom Estate leaving nothing to the Foundation, and ultimately nothing to the poor children of Panama.

142.    On October 6, 2010, Mario Chizmar, the Notary Public responsible for preparing the Will of Wilson Charles Lucom, filed a criminal complaint with the Legislative Assembly (the National Congress) of Panama, accusing the three Supreme Court Justices who issued the August 3, 2010 decision of violating the Constitution of Panama and various civil and criminal statutes by giving final and binding effect "to a false version of the last Will and testament of decedent." The Chizmar Complaint highlights the irregularities in the proceedings and decision of the three corrupt Judges on the Panamanian Supreme Court in the Lucom case.

143.    Dr. Teofanes Lopez Avila, on his own behalf, and in his capacity as an interested Panamanian citizen in defense of national assets (e.g., assets to the Foundation, and ultimately the poor children of Panama) also filed an Amparo petition on October 6, 2010 with the Supreme Court asking that all nine justices of the Supreme Court review *en banc* the three justices' panel decision issued August 6, 2010. The filing of the Amparo stayed the enforcement of the Supreme Court's decision of August 6, 2010. To date, however, no action has been taken on the Amparo and there is no indication that the Supreme Court will act on it.  The corrupt Panamanian Supreme Court decision cannot be implemented so long as the Amparo is in place and Hilda Lucom has died without ever being duly sworn as a replacement for Lehman as the sole Executor.

144.    On October 8, 2010, Lehman exercised his right to challenge the Supreme Court's decision and filed his own criminal complaint with the Legislative Assembly of Panama. Lehman's complaint accused the three Supreme Court Justices who issued the decision of "wrongful corruption of justice" –the corruption by public employees –as well as abuse of authority and breach of the duties of public employees.

145.    On November, 2010, a Panamanian Public Prosecutor also filed a motion to nullify every legal action that has taken place in the Lucom case except for Lehman's appointment and the gift of Lucom's money to the Foundation.  The Public Prosecutor noted that pursuant to various provisions of Panama's Civil Code, her office should have received notice of all proceedings in the Estate.  Thus, as alleged by the Public Prosecutor, under Panamanian law, the entire proceeding, but for the appointment of Lehman and the heirship declaration of the Foundation, was null and void.

**The Panamanian Supreme Court's Ruling is used to
further Interfere with the Florida Surcharge Action**

146.   On September 21, 2010, Hilda's Florida counsel, purporting to act for Valores, without regard or mention of the above remedial measures and ultimate stay of the decision by the three corrupt Judges of the Panamanian Supreme Court, and in order to avoid having an actual trial on the merits of the ownership of the shares of Valores, moved to dissolve a Florida Court's injunction that Lehman had obtained four years earlier enjoining Hilda from using the Valores funds.  Hilda's Florida counsel's motion was based, in pertinent part, on the corrupt Panamanian Supreme Court's decision that ruled Hilda as the "universal heir" of the Lucom Estate and the sole Executor of that Estate.

147.   On the basis of false information regarding the state of the Panamanian Supreme Court decision, on March 25, 2011, the Florida Court dissolved the injunction and Valores paid $2.8 Million from the asset of Lucom's Estate to a number of foreign corporations, whose owners, upon information and belief, are controlled by the Arias Group.   At the time of payment, the Panamanian Amparo freezing the Estate, the Prosecutor's motion seeking a nullification of the decision by the three corrupt Supreme Court Judges, and the two criminal complaints in the Panama Congress against the corrupt judges (including one by the Notary who witnessed the Will) were all known facts.  In seeking to dissolve the injunction, Valores and its counsel failed to disclose such facts to the Florida Court.  As a result, the injunction was dissolved and the theft of Valores and its assets by Defendants was complete. Hilda's Florida counsel's presentation to release the funds, perhaps through ignorance, was misleading and failed to disclose any of the above in court.

148.   Furthermore, the Arias Group's plan to steal Lucom's Florida Estate assets could not have been made possible but for the Arias Group's use of the court appointed Administrator in the Florida Ancillary Estate proceeding, who upon information and belief, was used as a conduit to further the Arias Group's conspiracy to steal Lucom's Florida Estate assets.   On February 6, 2007, Larry Miller ("Miller"), a Florida attorney was appointed Administrator Pendente Lite ("Administrator") in the Ancillary Estate proceeding.   This was after he gained Lehman's consent to the appointment by committing to defend the Valores Injunction put in place by Lehman as the legitimate Panama Executor. The Miller appointment was entered by the court in response to a filing by Hilda requesting a $600,000 bond from Lehman, which Hilda well knew Lehman could not match due to the Estate funds being frozen in Panama and Florida. Pursuant to the Appointment Order, Lehman no longer had standing to protect Lucom's Ancillary Estate, and instead Miller was charged with the duty to "protect the interests of the Florida Ancillary Estate" of Lucom. Sadly, Miller, after being paid with Valores funds, became a conduit in furtherance of the Arias Group's conspiracy.

149.   Though the estate laws and appellate laws of Florida are similar when it comes to the Executor's appointment, Miller, an expert in Estate Administration chose to ignore every single piece of evidence showing Lehman was the Albacea and ignored numerous calls and letters from Lehman's counsel regarding the facts and proof of ownership under British Virgin Islands law of the Valores shares by the Estate. The reason is simple.  Upon information and belief, Miller saw how large the Lucom Estate was and immediately ran up a big bill by preparing a report, failing to take into account Lehman's documents regarding the itemized breakdown of Lucom's assets, and how these assets were

handled by Lehman prior to the surcharge action. Miller quickly had a $140,000 bill. Because of his large outstanding Estate bill, Miller was now in the hole and the Estate had no money to pay him. Miller knew all the Estate funds were frozen. He remembered one source of income, though. He knew from Lehman that Hilda had stolen the bearer shares of Valores and Valores had plenty of money in the U.S. Miller then acted as the Arias' Group's conduit in furtherance of the conspiracy.  Rather than protect the Valores Estate assets, Miller testified at the trial in the surcharge action that he never committed to protect Valores.

150.    Thus, when Hilda's Florida counsel sought to release the Valores injunction, though Miller promised to defend the Valores shares, Miller quickly stepped aside as defender of Valores, and the dissolution action went unopposed. Miller's reason for not defending this most valuable liquid asset in the Estate was that his efforts would duplicate that of the beneficiaries.  From there, an unopposed Hilda was able to use the corrupt 2010 Panamanian Supreme Court ruling to defraud the Florida court into dissolving the injunction and pay $2.8 Million from the asset of Lucom's Estate to several foreign corporations (John Does 10-19), just like the sales of the 110 acres of the Hacienda Santa Monica beachfront, *see infra*.

### The Arias Group Completes the Plan to Steal the Lucom Estate in Panama and Deprive the Foundation of its Bequest

151.  Now that the Arias Group had effectively corrupted the Panamanian courts and ultimately mislead the Florida courts to obtain two corrupt judgments (e.g., 2009 Final Surcharge Judgment, and 2010 Panamanian Supreme Court decision), Judge Molina and Cañola, the court appointed administrator, have now sought to illegally sell the Hacienda ranch to third parties, in order to illegally steal the cash from these sales, and reap the

benefits.  The following resolutions were approved by Molina and Cañola and further signed off on by the "DIRRECCION NACIONAL DE CATASTRO MINISTERIO DE ECONOMIA Y FINANZAS.  MINISTRO" ("Catastro"):

    a.  Resolution No.  4   DATE: 03/14/2011;

    b.  Resolution No. 63   DATE: 03/14/2011;

    c.  Resolution No. 65  DATE: 03/14/2011;

    d.  Resolution No. 66 DATE: 03/14/2011;

    e.  Resolution No. 67  DATE: 03/14/2011;

    f.  Resolution No. 70  DATE: 03/15/11;

    g.  Resolution No. 71  DATE: 03/15/2011;

    h.  Resolution No. 72  DATE 03/15/2011;

    i.  Resolution No. 79  DATE 03/15/2011.

152.  With the consent and approval of Judge Molina, the probate Judge responsible for overseeing Cañola's illegal Appointment, Cañola has purported to sell tracts of land from the 110 acres of prime Panamanian beach front property to third parties (John Does 1-9) for the benefit of Cañola, Molina, and the Arias Group. These illegal sales of Hacienda, a Lucom Estate asset, are a blatant and utter theft that has deprived the Foundation, and ultimately the children of Panama, of their duly entitled bequest, pursuant to Lucom's intentions and Will.

153.  Plaintiffs have retained the undersigned counsel and have agreed to pay them a reasonable fee for their services. All conditions precedent to the maintenance of this action have been performed, occurred, or have otherwise been excused.

**CLAIMS FOR RELIEF**
**COUNT I – RICO, 18 U.S.C. § 1962 (c)**
**(Against All Defendants)**

154.   Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full:

155.   At all relevant times, each Plaintiff is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

156.   At all relevant times, each Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

**The RICO Enterprise**

157.   The Defendants are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint; namely, through a multi-faceted campaign of lies, fraud, threats and official corruption with the single purpose of stealing for themselves the vast fortune of Lucom's Estate, who left that fortune through his Last Will and Testament, to his Foundation for the benefit of the poor and needy children of the Republic of Panama. These Defendants have organized their operation into a cohesive group with specific and assigned responsibilities and a command structure, operating in the United Sates and Panama, funded primarily from the United Sates.  Over the years, Defendants have adapted their scheme to changing circumstances, recruiting new members to their operation, and expanding the scope and nature of their activities. While the organization of the criminal enterprise has changed over time, and its members may have held different roles at different times, the criminal enterprise has generally been structured to operate as a unit in order to accomplish the goals of their criminal scheme:

60

a.  Defendants Hilda, Madelaine, Margarita, Melinda, Frank, and Gilberto, have served as heads of the criminal enterprise and have been primarily responsible for engaging in an "all out" campaign to steal the assets of Lucom's Estate.

b.  Defendants Infante, Ramos, and the Infante Firm have served as "consigliere" of the criminal enterprise and have been primarily responsible for stealing Lucom's Estate Assets through prosecuting the sham litigation in the Panamanian courts, exerting influence over and colluding with the Panamanian Prosecutor offices, Panamanian Interpol Agency, Panamanian Probate Courts, and Panamanian Supreme Court, and using corrupt Panamanian Orders with the intent of introducing these Orders in Florida to mislead the Florida courts.

c.  Defendant Molina was the presiding trial Judge in the Fifth District in Panama City, Panama, with jurisdiction in the administration of the Lucom Estate pending in Panama, and served as a conduit for furthering the Defendants' criminal enterprise.

d.  Defendant Cañola was appointed by Molina to serve as the Administrator of the assets located in Panama in the Lucom Estate, and has served as a conduit for furthering the Defendants' criminal enterprise.

e.  Defendants Parodi and Bernal served as a conduit in the Panamanian Fourteenth and Fourth Prosecutors office, respectively, for furthering the Defendants' criminal enterprise.

    f.   Defendants Ortega, Cigarruista and Mitchell served as a conduit in the Panamanian Supreme Court for furthering Defendants' criminal enterprise.

    g.   Defendants John Does 1 through 9 are unknown co-conspirators and subsequent transferees of the Hacienda tracts of land located in Panama City, Panama, which were assets of the Lucom Estate, and served as a conduit for furthering Defendants' criminal enterprise.

    h.   Defendants John Does 10 through 19 are unknown co-conspirators and subsequent transferees of the funds stolen from bank accounts located in Florida which were assets of the Lucom Estate, and served as a conduit for furthering Defendants' criminal enterprise.

158.   The Defendants constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962 (c), referred to hereinafter as the "Enterprise." Each of the Defendants participated in the operation or management of the Enterprise.

159.   At all relevant times, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962 (c).

### Pattern of Racketeering

160.   The Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961 (5) and in violation of 18 U.S.C. § 1962 (c), to wit:

*Pattern of Racketeering Activity: Mail Fraud and Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343*

161.   As described herein, the Defendants engaged in a wide-ranging scheme or artifice to defraud various courts of law, government and non government agencies, and the

greater public concerning the state of Lucom's Will, its executors, and intended beneficiaries. The ultimate objective of the Defendants scheme or artifice to defraud is to steal for themselves the vast fortune of Lucom's Estate, who left that fortune through his Last Will and Testament, to his Foundation for the benefit of the poor and needy children of the Republic of Panama

162.   In furtherance of their scheme, and as described herein, the Defendants transmitted, or caused to be transmitted, by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including but not limited to the followings:

a.   On or about August 25, 2006 Hilda, with the assistance of the other members of the Arias Group, sent the minutes of the purported August 25, 2006 Valores shareholder meeting by mail or wire to Wachovia Bank in Florida claiming to be in control of Valores in an attempt to steal Valores' $3.4 Million in the Wachovia account.

b.   On December 12 and 13, 2007, the Panama America newspaper published on their website two articles that falsely reported that Lehman was charged with a multiplicity of crimes in Panama.

c.   On September 10, 2007, Prosecutor Bernal issued by mail or wire official document No. 3745 addressed to Jose Ayu Prado, who was the Director of the Judicial Technical Police.

d.   On October 24, 2007, Infante faxed Bernal's letter to NCB Interpol Panama who, as part of the conspiracy with Infante and the Arias Group issued a Red Notice alert to more than 170 countries worldwide, including the United States.

e.   On or about October 26, 2007 NCB Interpol Panama responded by mail or wire to the United States Interpol office's October 25, 2007 letter requesting more documentation regarding NCB Panama Interpol's Red Notice on Lehman.

163.   The Defendants knowingly devised or participated in the scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations and promises. This scheme or artifice involved the making of misrepresentations intended and reasonably calculated to deceive persons of ordinary

prudence and comprehension. Further, Defendants caused the above mails and wires to be used with the knowledge that the use of the mails and wires will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended. Particularly, the Defendants' false and misleading statements related to the true ownership of Valores' bearer shares, as well as the status and frivolous nature of the Panamanian criminal charges asserted against Lehman. These material facts that have been relied on by U.S. Courts, U.S. governmental agencies, Panamanian courts, the media, by means of their acceptance of Defendants' misrepresentations and omissions and their failure to take meaningful corrective action.

164.    The Defendants acted willfully and with an intent to defraud.

***Pattern of Racketeering Activity: Extortion in Violation of Hobbs Act, 18 U.S.C. § 1951***

165.    At all times material to this Complaint, Defendants were engaged in interstate and foreign commerce and in an industry that affects interstate and foreign commerce.

166.    Defendants deliberately obstructed, delayed or affected commerce as defined in 18 U.S.C. § 1951 (b)(3) by extorting, or attempting to extort as that term is defined in 18 U.S.C. § 1951(b)(2), and conspiring to extort the vast fortune of the assets of Lucom's Estate, to which Defendants were not entitled, through the conduct of an improper campaign of threats of financial harm, physical harm, violence and harassment, intended to induce fear in the Plaintiffs that Defendants will, among other things: (1) continue to pursue a scheme of misrepresentation to the great harm and public denigration of Plaintiffs, unless and until Plaintiffs "give up" or are "bought out"; (2) continue to conspire with Panamanian officials to have Plaintiffs and their attorneys criminally prosecuted on

trumped up charges; and (3) secure Panamanian orders against Plaintiffs and use said orders, as well as orders obtained from current and future lawsuits in Panama to be used in the United States and in other foreign jurisdictions seeking recognition and enforcement of these orders. These actions, as described herein, have created a reasonable fear of harm on the part of Plaintiffs, including fear of violence, death and economic harm, all in violation of 18 U.S.C. § 1951(a), to wit:

a. On August 31, 2006 in Order 1227 Lehman was "suspended" as Executor and prevented "from availing himself of his designation as executor of the Will in the estate of the late Wilson Charles Lucom from performing acts of administration, establishment of liens, or any acts of disposition of the property of the testate . . . ."

b. On September 11, 2006, Infante, the Infante Firm, and Ramos, filed the first Denuncias and falsely accused Lehman and Ruddy of the murder of Lucom.

c. On September 11, 2006 the Arias Group, through the Infante Firm (purportedly on behalf of Hilda), filed a second Denuncia against Lehman, Crosbie, Ospina and others which falsely charged them with: (1) aggravated assault; (2) forgery of documents; (3) illegal exercise of a profession; (4) unlawful association to commit crimes; (5) perfidy; (6) falseness; (7) aggravated swindle; and (8) fraud.

d. On September 14, 2006 a third Denuncia was filed by Hilda which falsely accused Lehman of stealing Lucom's Estate checks. This third Denuncia falsely charged Lehman with: (1) the crime of swindle; and (2) theft.

e. On October 12, 2006, the Arias Group filed a petition to revoke the Letters of Administration issued to Lehman in the Florida Ancillary Estate proceeding, and filed a surcharge action in the proceeding where they falsely contended that it was wrong for Lehman (as the Florida Ancillary Executor) to defend Lucom's Will in Panama with money from Lucom's Florida Bank account.

f. On November 30, 2006, Infante attempted to bribe Lehman to resign as Executor of Lucom's Estate with a bribery offer of $3 Million cash.

g. In or about November 2006, Infante and/or the Arias Group attempted to bribe Ruddy, and offered to forgive Ruddy's $1.5 Million debt to Valores and to drop the murder and gang charges against Ruddy, in exchange for Ruddy's cooperation with the Arias Group.

h. On August 28, 2007, the Infante Firm, purportedly representing Infante, filed a criminal complaint against Lehman for extortion, defamation and slander. Shortly thereafter, Parodi issued an illegal arrest warrant for these charges.

i. On September 10, 2007, Bernal indicted Lehman and issued the Gang Theft Warrant. It called for Lehman's immediate preventive detention and arrest without a trial.

j. On October 31, 2007 Bernal enclosed an official indictment of Infante's charges against Lehman, Lehman's Panamanian attorney Crosbie and others, accusing

65

said individuals of committing crimes against the property and legal authority of the Lucom Estate.

k. On November 21, 2007, Judge Molina of the Fifth Circuit, at the request of Infante, appointed Defendant Cañola as the administrator of the Testamentary Succession of Lucom.

l. Ramos filed a criminal complaint against Lehman, Lehman's Panamanian attorney Crosbie and others, accusing said individuals of committing crimes against the property and legal authority of the Lucom Estate.

m. On December 12 and 13, 2007, the Panama America newspaper published two articles falsely reporting that Lehman was charged with a multiplicity of crimes in Panama.

n. In or about December 2007 Infante also filed a complaint with the Panamanian criminal courts to shut down Lehman's United States based website, www.lucom-ninospobresdepanama.com, which published Lehman's efforts to provide for the poor children of Panama. Lehman's "ninospobresdepanama" website was also linked to his law firm website, which was also shut down.

o. On August 26, 2008 Judge Molina issued Order 952 and held that Lehman's appointment as personal representative in Panama was a nullity.

p. On November 4, 2008 Avila was shot through his jaw by an unknown assailant. Upon information and belief this was committed at the direction of the Arias Group.

q. On February 6, 2009 Melinda and Infante made numerous personal threats to the various charities involved in negotiations with Lehman, including but not limited to, Hogar de San Jose de Malambo and Nutre Hogar, warning them that if they accepted the agreement for charitable funds from Lucom's Estate, the charities would be harmed by the "Panama America" Newspaper, a daily newspaper of general circulation in Panama, with a corresponding website that is circulated in Florida and throughout the world, and that until recently was owned and controlled by the Arias Group.

r. On February 6, 2009 Lehman was pulled off his return flight to Florida by immigration officials, and placed in jail, where he was held by Panamanian police for nearly 15 hours.

s. On February 9, 2009, Lehman was pulled of his return flight to Florida by immigration officials.

t. On February 27, 2009, the Second Superior Court without providing notice to Lehman ordered the seizure of Lehman's websites.

u. On August 6, 2010, in consideration for Infante's $1.5 Million bribe to each of the three Panamanian Supreme Court Justices presiding over Hilda's appeal, the Supreme Court of Panama issued the indefensible decision that repudiated Lehman's status as Executor –and that of Ruddy as co-Executor –and nullified Lehman's efforts since July 2006 to carry out his professional duty to defend the Will and implement its provisions.

**Pattern of Racketeering Activity: Extortion in Violation of Section 836.05 of the Florida Statutes.**

167.   Similarly, Defendants' verbally, or by way of a written or printed communication, maliciously threatened to accuse Plaintiffs of false crimes; maliciously threatened to injure Plaintiffs, their property, or reputation; all with the intent to extort money or pecuniary advantage, or with intent to compel Plaintiffs to do acts or refrain from doing acts against their will in violation of § 836.05, Fla. Stat. (2011).

168.   The Defendants threats were intentional and without any lawful justification.

**Patterns of Racketeering Activity: Money Laundering in Violation of 18 U.S.C. § 1956**

169.   Defendants have on multiple occasions, acting in their individual capacities, and as agents for Hilda and the Arias Group, knowingly caused the transportation, transmission, and/or transfer of funds to or from the United States to themselves, and other entities with the intent that those funds be used to promote the carrying on of unlawful activity, including but not limited to violations of 18 U.S.C. §§ 1341, 1343, and 1951, to wit:

    a.  Hilda purported to hold a Valores shareholders meeting in Panama on August 25, 2006, at which time Hilda possessed the bearer shareholder certificates which had been stolen by Hilda from Lucom's office after Lucom's death. At the meeting, Hilda falsely claimed to be the sole owner of Valores. She then purportedly voted herself as the sole director of Valores.

    b.  On or about August 25, 2006 Hilda, with the assistance of the Arias Group, then sent the minutes of the purported August 25, 2006 Valores shareholder meeting to Wachovia Bank in Florida claiming to be in control of Valores in an attempt to steal Valores' $3.4 Million in the Wachovia account.

    c.  On September 25, 2006 Hilda held a shareholder meeting in Panama during which she purportedly voted to sell all of Valores' stocks and bonds in the vFinance account (worth approximately $370,000)  and pay the money to a corporation named Orellana Capital Group Inc.

    d.  Resolution No.  4 – DATE: 03/14/2011 – Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #1.

    e.  Resolution No.  63 – DATE: 03/14/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #2.

  f. Resolution No. 65 – DATE: 03/14/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #3.

  g. Resolution No. 66 – DATE: 03/14/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #4.

  h. Resolution No. 67 – DATE: 03/14/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #5.

  i. Resolution No. 70 – DATE: 03/15/11– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #6.

  j. Resolution No. 71 – DATE: 03/15/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #7.

  k. Resolution No. 72 – DATE 03/15/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #8.

  l. Resolution No. 79 – DATE 03/15/2011 – Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #9.

  m. On March 25, 2011 $2.8 Million of Valores' assets were transferred to John Does #10-19 because of omissions and/or misrepresentations made to the Florida Court.

170. Defendants' financial transactions, or attempted transactions were made when the Defendants knew the property involved in the transactions represented proceeds of unlawful activity, the property involved was in fact the proceeds of the Defendants unlawful activity, and the Defendants conducted the financial transaction with the intent to promote the carrying on of the specified unlawful activity.

171. Further, Defendants' financial transactions herein affected interstate or foreign commerce involving the movement of funds by wire or other means.

***Pattern of Racketeering Activity: Dealing in Stolen Property in Violation of Section 812.019 of the Florida Statutes***

172. Similarly, Defendants have trafficked or endeavored to traffic in, property the Defendants knew or should have known was stolen.

***Pattern of Racketeering Activity: Witness Tampering in Violation of 18 U.S.C. § 1512***

173. Defendants knowingly engaged in intimidation, threats, misleading conduct, and corrupt persuasion toward Lehman, Ruddy, Crosbie, Avila, and Ospina, with the specific intent to influence, hinder, delay, and/or prevent these witnesses from testifying or

cause these witnesses to withhold records, objects, documents, and testimony from an official proceeding, to wit:

    a. In or about November 2006, Infante and/or the Arias Group attempted to bribe Ruddy, and offered to forgive Ruddy's $1.5 Million debt to Valores and to drop the murder and gang charges against Ruddy, in exchange for Ruddy's cooperation and/or false testimony in favor of the Arias Group.

    b. On November 30, 2006, Infante attempted to bribe Lehman to resign as Executor of Lucom's Estate with a bribery offer of $3 Million cash.

    c. On November 4, 2008 Avila was shot through his jaw by an unknown assailant. Upon information and belief this was committed at the direction of the Arias Group.

    d. On February 6, 2009 Lehman was about to return to Florida to defend himself at the trial in Florida in the Arias Group's frivolous surcharge action (which was specially set for trial later that month). Lehman was pulled off his return flight to the United States by immigration officials, placed in jail, and was held by Panamanian police for nearly 15 hours.

    e. On February 9, 2009, Lehman boarded a plane to return to Florida for his surcharge action and was once again pulled off the plain by immigration authorities based on a new detention order.

***Pattern of Racketeering Activity: Witness Tampering in Violation of Section 914.22 of the Florida Statutes***

174.   Similarly, Defendants' have knowingly used intimidation or physical force, or threatened another person, or attempted to do so, or engaged in misleading conduct toward another person, or offered pecuniary benefit or gain to another person with the intent to cause or induce a person to withhold testimony, a record, document, or other object, from an official investigation or official proceeding; alter, destroy, mutilate or conceal an object with intent to impair the integrity or availability of the object for use in an official investigation or proceeding, testify untruthfully, or any violation of § 914.22, Fla. Stat. (2011).

**Pattern of Racketeering: Obstruction of Justice in Violation of 18 U.S.C. § 1503**

175.    Defendants' have corruptly, or by threats of force, or by any threatening letter or communication, endeavored to influence, obstruct, or impede the due administration of justice in violation of 18 U.S.C. § 1503, to wit:

a.  In late July or early August 2006, Hilda stole the bearer shares of Valores from Lucom's file cabinet.

b.  On or about September 27, 2006 the Arias Group returned the Valores bearer shares to Lucom's filing cabinet to defraud the Panamanian police investigation.

c.  On November 30, 2006, Infante attempted to bribe Lehman to resign from office with a bribery offer of $3 Million cash.

d.  In or about November 2006, Infante and/or the Arias Group attempted to bribe Ruddy, and offered to forgive Ruddy's $1.5 Million debt to Valores and to drop the murder and gang charges against Ruddy, in exchange for Ruddy's cooperation with the Arias Group.

e.  On March 1, 2007 Hilda provided false deposition testimony regarding her ownership of the Valores shares.

f.  Following the November 22, 2007 Order declaring Bernal's gang warrant illegal, Bernal did not advise the Interpol agencies in Panama, the United States, and abroad of the Superior Court's dismissal which lead to the arrest of Crosbie.

g.  On June 16, 2008 Infante intentionally failed to serve Lehman's attorney in Panama with notice of Infante's appeal of the order shutting down Lehman's websites.

h.  On August 26, 2008 Judge Molina issued Order 952 and held that Lehman's appointment as personal representative in Panama was a nullity. At the surcharge trial in February 2009 in Florida, the Florida court then relied upon Order 952, and the Arias Group orchestrated false opinion testimony of Panamanian attorney Rodriguez Avila that the Panamanian probate court's order appointing Lehman as Albacea in Panama was "automatically and immediately null and void when Hilda P. Lucom filed her appeal of that Order," and that "Lehman was not installed or properly serving as Albacea of the Panamanian Estate."

i.  On February 6, 2009 Lehman was about to return to Florida to defend himself at the trial in Florida in the Arias Group's frivolous surcharge action (which was specially set for trial later that month). Lehman was pulled off his return flight to the United States by immigration officials, placed in jail, and was held by Panamanian police for nearly 15 hours.

j.  On February 9, 2009, Lehman boarded a plane to return to Florida for his surcharge action and was once again pulled off the plain by immigration authorities based on a new detention order.

k.  On August 6, 2010, in consideration for Infante's $1.5 Million bribe to each of the three Panamanian Supreme Court Justices presiding over Hilda's appeal, the Supreme Court of Panama issued the indefensible decision that repudiated Mr. Lehman's status as Executor –and that of Ruddy as co-Executor –and nullified

Lehman's efforts since July 2006 to carry out his professional duty to defend the Will and implement its provisions.

l.  Resolution No. 4 – DATE: 03/14/2011 – Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #1.

m.  Resolution No. 63 – DATE: 03/14/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #2.

n.  Resolution No. 65 – DATE: 03/14/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #3.

o.  Resolution No. 66 – DATE: 03/14/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #4.

p.  Resolution No. 67 – DATE: 03/14/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #5.

q.  Resolution No. 70 – DATE: 03/15/11– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #6.

r.  Resolution No. 71 – DATE: 03/15/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #7.

s.  Resolution No. 72 – DATE 03/15/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #8.

t.  Resolution No. 79 – DATE 03/15/2011 – Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #9.

176.  The Defendants actions herein were a concerted effort to thwart Plaintiffs attempts to protect the assets of Lucom's Estate. Defendants actions were made with the natural and probable effect of interfering with the due administration of justice, and Defendants' have done so with the specific intent or corrupt motive to influence, obstruct, or impede the due administration of justice in violation of 18 U.S.C. § 1503, or violations of this section was a reasonably foreseeable result.

***Pattern of Racketeering: Obstruction of Justice in Violation of Section 843.02 of the Florida Statutes***

177.  Similarly, Defendants' have obstructed an officer as defined in §§943.10(1)-(9), Fla. Stat., or other person defined in § 843.02, Fla. Stat., without offering or doing violence to the person of the officer in violation of § 843.02, Fla. Stat, while said officer was engaged in the lawful execution of a legal duty.

71

178.    Defendants actions were done with knowledge that they were obstructing an officer defined in §§943.10(1)-(9), Fla. Stat., or other person defined in § 843.02, Fla. Stat.

**_Pattern of Racketeering: Violation of 18 U.S.C. § 1952(a)(3)(A) (the Travel Act)_**

179.    Defendants have also traveled in interstate or foreign commerce or used the mail or any facility in interstate or foreign commerce with intent to distribute the proceeds of unlawful activity, or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity in violation of 18 U.S.C. § 1952, to wit:

a. Ramos and the Infante Firm's presence in Florida included, but were not limited to, an October 2006 and March 1, 2007 appearances at Hilda's depositions in the Florida surcharge action.

b. On January 12, 2007, Hilda, by way of Ramos and the Infante Firm, falsely represented to the Florida court that Panamanian law required Ramos's representation of Hilda at these depositions.

c. On November 21, 2007, Judge Molina of the Fifth Circuit, at the request of Infante, appointed Defendant Cañola as the administrator of the Testamentary Succession of Lucom.

d. On or about June 2008 Infante went to lunch at Café Marisco in Panama with Justice Mitchell, and two attorneys, and offered each of the three presiding Supreme Court Justices $1.5 Million to issue an Order that named Hilda as the sole Executor and "universal heir" of Lucom's Estate.

e. On August 26, 2008 Judge Molina issued Order 952 and held that Lehman's appointment as personal representative in Panama was a nullity. At the surcharge trial in February 2009 in Florida, the Florida court then relied upon Order 952, and the Arias Group orchestrated false opinion testimony of Panamanian attorney Rodriguez Avila that the Panamanian probate court's order appointing Lehman as Albacea in Panama was "automatically and immediately null and void when Hilda P. Lucom filed her appeal of that Order," and that "Lehman was not installed or properly serving as Albacea of the Panamanian Estate."

f. On February 6, 2009 Lehman was about to return to Florida to defend himself at the trial in Florida in the Arias Group's frivolous surcharge action (which was specially set for trial later that month). Lehman was pulled off his return flight to the United States by immigration officials, placed in jail, and was held by Panamanian police for nearly 15 hours.

g. On February 9, 2009, Lehman boarded a plane to return to Florida for his surcharge action and was once again pulled off the plain by immigration authorities based on a new detention order.

h. Resolution No. 4 – DATE: 03/14/2011 – Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #1.
i. Resolution No. 63 – DATE: 03/14/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #2.
j. Resolution No. 65 – DATE: 03/14/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #3.
k. Resolution No. 66 – DATE: 03/14/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #4.
l. Resolution No. 67 – DATE: 03/14/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #5.
m. Resolution No. 70 – DATE: 03/15/11– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #6.
n. Resolution No. 71 – DATE: 03/15/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #7.
o. Resolution No. 72 – DATE 03/15/2011– Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #8.
p. Resolution No. 79 – DATE 03/15/2011 – Approved by Molina and Cañola, signed off on by Catastro and transferred to John Doe #9.

180. Infante and the Arias Group's bribes to foreign public officials are a violation of the Foreign Corrupt Practices Act, 18 U.S.C. § 78dd-2. Particularly, the Arias Group used Infante as their agent to use the mails or instrumentalities of interstate commerce to offer or pay bribes to foreign officials for the purpose of: (i) influencing the acts or decisions of such foreign officials in their official capacity; (ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, (iii) securing any improper advantage; or (iv) inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality.

181. Each of the Defendant's has engaged in multiple predicate acts, as described in paragraphs 160 - 180, *supra.* The conduct of each of the Defendant's described in paragraphs 160 - 180, *supra,* constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

182.    Plaintiffs Lehman and Lehman, P.A., have been injured in their business and property. Lucom's Estate and the Foundation have been injured to their property by way of Defendants' violations of 18 U.S.C. § 1962 (c). The injuries to Plaintiffs caused by reason of the violations of 18 U.S.C. § 1962 (c), include but are not limited to damage to Plaintiffs reputation and goodwill, damage to assets of Lucom's Estate and the Foundation, damage to Lehman's law practice, and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in Panama and in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the Defendants' RICO violations and conspiracy to violate RICO in this proceeding.

183.    Further, these injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962. Plaintiffs are the ultimate victim of the Defendants' unlawful Enterprise. Plaintiffs have been and will continue to be injured in their business and property in an amount to be determined at trial.

184.    Pursuant to 18 U.S.C. 1964(c), Plaintiffs are entitled to recover treble damages, plus costs and attorneys' fees from the Defendants.

185.    Plaintiffs are further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins the RICO Defendants, their assignees and anyone else acting in concert with them, from commencing, prosecuting or otherwise advancing in any way, directly or indirectly, any attempt to recognize or enforce the Panama Supreme Court Order in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any property of Lucom's Estate, until this Court determines the merits and enters judgment on Plaintiffs claims against Defendants in this action.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## COUNT II – CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants)

186.   Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

187.   The Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962 (c) as described above, in violation of 18 U.S.C. § 1962 (d).

188.   Upon information and belief, the Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

189.   Upon information and belief, Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962 (c).

190.   Each Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain the assets of Lucom's Estate. It was part of the conspiracy that the Defendants would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth in paragraphs 160 - 180, *supra*.

191.   As a direct and proximate result of the Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs Lehman and Lehman, P.A., have been injured in their business, and Plaintiffs Lehman, as Executor of Lucom's Estate

and the Foundation, have been injured to their property, including damage to Plaintiffs' reputation and goodwill; and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in Panama and in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the Defendants' RICO violations and conspiracy to violate RICO in this proceeding.

192.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages, plus costs and attorneys' fees from the Defendants.

193.   Plaintiffs are further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins the Defendants, their assignees and anyone else acting in concert with them, from commencing, prosecuting or otherwise advancing in any way, directly or indirectly, any attempt to recognize or enforce the Panama Supreme Court Order in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any property of Lucom's Estate, until this Court determines the merits and enters judgment on Plaintiffs claims against Defendants in this action.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## COUNT III – RICO, Fla. Stat. § 895.03 and § 772.104
### (Against All Defendants)

194.   Plaintiffs reallege and incorporate paragraphs 1 to 153 as if fully set forth herein.

195.   At least since 2006 and continuously through the present date, Defendants were associated together in fact as an enterprise, and these individuals and entities did unlawfully, willfully and knowingly violate Section 895.03 and Section 772.103 of the Florida Statutes by conducting and by participating, directly or indirectly, in the conduct of

76

the affairs of Enterprise through a pattern of racketeering activity which involved multiple violations of the criminal laws of the State of Florida and the United States of America.

196.    The pattern of racketeering activity involves multiple violations of the criminal laws of the State of Florida and the United States which are related and which amount to, or pose a threat of, continued criminal activity, *see* paragraphs 160 - 180, *supra.*

197.    As described above, by reason of violation of Fla. Stat. Ch. 895 and Ch. 772, Plaintiffs have been injured.

198.    WHEREFORE, Plaintiffs prays for judgment as set forth below.

## <u>COUNT IV – UNJUST ENRICHMENT</u>
### (Against All Defendants)

199.    Plaintiffs reallege and incorporate paragraphs 1 to 153 as if fully set forth herein.

200.    The Defendants have received and retained the benefit of the Assets of Lucom's Estate, including the assets of Lucom's Ancillary Estate in Florida.

201.    At the time the benefit was conferred, the Defendants knew about the benefit being conferred.

202.    Defendants' accepted and retained the benefit conferred upon it by the assets of Lucom's Estate, including the assets of Lucom's Ancillary Estate in Florida.

203.    Under the circumstances, it would be unjust and inequitable for the Defendants to retain the benefit conferred upon it without paying for it.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## COUNT V – CONVERSION
### (Against All Defendants)

204.   Plaintiffs reallege and incorporate paragraphs 1 to 153 as if fully set forth herein.

205.   Through the Defendants extortion and corruption, they have wrongfully exercised dominion over the assets of Lucom's Estate, including the assets of Lucom's Ancillary Estate in Florida.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## PRAYER FOR RELIEF

1.   As to the First and Second Claims for Relief:

a. Plaintiff Lehman seeks general damages according to the proof at trial, trebled according to statute 18 U.S.C. 1964 (c); for prejudgment interest according to statute; a constructive trust placed on the assets of Lucom's Estate; permanent and injunctive relief; and for Plaintiffs reasonable attorneys' fees, expert witness fees, and costs according to 18 U.S.C. 1964 (c).

b. Plaintiff Lehman, in his capacity as the duly appointed Executor of the Panama Estate of Wilson C. Lucom, seeks general damages according to the proof at trial, trebled according to statute 18 U.S.C. 1964 (c); for prejudgment interest according to statute; a constructive trust placed on the assets of Lucom's Estate; permanent and injunctive relief; and for Plaintiffs reasonable attorneys' fees, expert witness fees and costs according to 18 U.S.C. 1964 (c).

c.  Plaintiff, Lehman, P.A., seeks general damages according to the proof at trial, trebled according to statute 18 U.S.C. 1964 (c); for prejudgment interest according to statute; a constructive trust placed on the assets of Lucom's Estate; permanent and injunctive relief; and for Plaintiffs reasonable attorneys' fees, expert witness fees and costs according to 18 U.S.C. 1964 (c).

d.  Plaintiff, the Foundation seeks general damages according to the proof at trial, trebled according to statute 18 U.S.C. 1964 (c); for prejudgment interest according to statute; a constructive trust placed on the assets of Lucom's Estate; permanent and injunctive relief; and for Plaintiffs reasonable attorneys' fees, expert witness fees and costs according to 18 U.S.C. 1964 (c).

2.  As for the Third Claim for Relief

a.  An award of general damages and all monetary relief authorized by law or referenced in the Complaint, including special damages against Defendants jointly and severally under all counts;

b.  An award for trebled damages, reasonable attorneys fees and court costs pursuant to Fla. Stat. § 772.104;

c.  An award of the forfeited property or to the proceeds derived therefrom pursuant to Fla. Stat. § 895.05;

d.  Preliminary and permanent injunctive relief pursuant to Fla. Stat. § 895.05;

e.  An award of prejudgment and post judgment interest;

    f.   An award providing for payment of costs of suit, including payment experts' fees and expenses; and

    g.   Such other relief as this Court deems proper.

3.  As to the Fourth and Fifth Claims for Relief

    a.   Plaintiffs seeks judgment in an amount to be determined at trial, and such other and further relief as this Court deems appropriate and just.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs demands trial by jury of all issues so triable.

Dated:  September 23, 2011

Respectfully submitted,

CAREY RODRIGUEZ GREENBERG O'KEEFE, LLP

By:   */s Juan J. Rodriguez, Esq.*
      Juan J. Rodriguez, Esq.
      Florida Bar No. 613843
      jrodriguez@crgplaw.com
      David P. Milian, Esq.
      Florida Bar No. 844421
      dmilian@crgplaw.com
      David M. Levine, Esq.
      Florida Bar No. 84431
      dlevine@crgplaw.com
      1395 Brickell Avenue, Suite 700
      Miami, FL 33131
      Telephone: 305-372-7474
      Facsimile:  305-372-7475
      *Attorneys for Plaintiffs*